866 So.2d 1016 (2004)
STATE of Louisiana
v.
Charles STEWART.
No. 03-KA-920.
Court of Appeal of Louisiana, Fifth Circuit.
January 27, 2004.
*1019 John M. Crum, Jr., District Attorney, Rodney A. Brignac, Assistant District Attorney, LaPlace, LA, for Plaintiff/Appellee, The State of Louisiana.
Holli Herrle-Castillo, Marrero, LA, for Defendant/Appellant, Charles Stewart.
Panel composed of Judges JAMES L. CANNELLA, MARION F. EDWARDS and WALTER J. ROTHSCHILD.
WALTER J. ROTHSCHILD, Judge.
On October 26, 1999, a St. John the Baptist Parish grand jury indicted the defendant, Charles Stewart, for distribution of cocaine in violation of LSA-R.S. 40:967(A). The defendant was arraigned on November 29, 1999 and pled not guilty. On April 30 and May 1, 2001, the case was tried before a 12-person jury which found the defendant guilty as charged. The State filed a multiple bill on August 21, 2001, alleging the defendant to be a second felony offender, and the defendant denied the allegations of the multiple bill on August 22, 2001. On September 19, 2001, the trial court found the defendant to be a second felony offender and sentenced him to 47 years with the Department of Corrections. The defendant moved for an appeal, which was granted by the trial court.
FACTS
Agent Gilbeau of the Terrebonne Parish Sheriff's Office testified that, on September 30, 1999, she and a confidential informant (CI) traveled on Railroad Avenue in Reserve. Agent Gilbeau, who was driving the vehicle, observed a black male, later identified as the defendant, standing on Northwest First Street. The defendant flagged her down, so Agent Gilbeau backed up the vehicle. The defendant approached the driver's side window and asked what she wanted. Agent Gilbeau asked the defendant for a "40," which she explained is $40.00 worth of crack cocaine.
The defendant subsequently dropped three pieces of crack cocaine into her left *1020 hand, and Agent Gilbeau reached for her money. The CI asked the defendant if there was a number where they could reach him later, and the defendant said he would get the number. He walked away from the vehicle and into a residence. While they were waiting, Agent Gilbeau moved her vehicle to the shoulder of the road in front of the residence. The defendant came out shortly afterward, approached the passenger side of the vehicle, and handed Agent Gilbeau a matchbook with a number and the name "Charles" on it. Agent Gilbeau testified that he wanted her to call him later to purchase more crack cocaine.
After the defendant gave her the matchbook, Agent Gilbeau handed him the money. The defendant walked away with a cell phone in his left hand and the money in his right hand. Agent Gilbeau turned around in a church parking lot and drove off. She placed the cocaine in a small plastic bag, sealed it, and gave it to Detective Hidalgo. Agent Gilbeau positively identified the defendant in court, and testified that she had never met the defendant prior to the transaction.
Detective Troy Hidalgo of the St. John the Baptist Parish Sheriff's Office testified that he was in charge of an operation which utilized undercover agents to buy narcotics from street level dealers within documented high crime areas of St. John Parish. He testified that, on September 30, 1999, he sent Agent Michelle Gilbeau to buy narcotics in an unmarked vehicle equipped with video and audio recording devices. Detective Hidalgo monitored the transaction involving the defendant by audio two blocks away. After the transaction took place, he met with Agent Gilbeau and obtained the narcotics from her.
Detective Hidalgo viewed the videotape of the transaction and positively identified the defendant, with whom he was familiar. The tape, which was played for the jury, shows a vehicle proceeding down a road. A black male, who is standing on the side of the road, approached the driver's side window with a cell phone in his left hand. The black male subsequently dropped something from his right hand into the driver's left hand and then walked away from the vehicle. The driver then pulled to the side of the road, and the black male approached the passenger side window. When he stepped away from the vehicle, it appears that he had something in his right hand and a cell phone in his left hand. The driver then pulled away. Although conversation can be heard throughout the tape, the volume is too low to ascertain what was being said.
John Palm, Jr., a criminalist with the New Orleans Police Department who was qualified as an expert in the field of drug analysis, testified that he performed an analysis of the substance in this case and found it to be positive for cocaine. He did not weigh the substance, but he estimated its weight to be between one tenth and three tenths of a gram.
The defense did not call any witnesses.
DISCUSSION
In his first assignment of error, the defendant argues that the trial court erred in granting the State's "reverse Batson" challenges of two prospective jurors, Morris Jeandron and Mary Snyder.[1] He contends that the State did not prove that defense counsel was engaging in purposeful discrimination, that his reasons for challenging the jurors in question were race neutral, and that the trial court did not allege that the State had met its burden of proving purposeful discrimination.
*1021 The United States constitution prohibits the State from engaging in purposeful discrimination on the grounds of race in the exercise of peremptory challenges. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). It also prohibits the defendant from engaging in such conduct. Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992); State v. Knox, 609 So.2d 803 (La. 1992). When the State makes an objection to the defense's challenge of prospective jurors, it is sometimes referred to as a "reverse-Batson." State v. Shepherd, 02-1006 (La.App. 3 Cir. 3/5/03), 839 So.2d 1103, 1106. Louisiana law codifies this concept in LSA-C.Cr.P. art. 795(C), which provides:
No peremptory challenge made by the state or the defendant shall be based solely upon the race of the juror. If an objection is made that the state or defense has excluded a juror solely on the basis of race, and a prima facie case supporting that objection is made by the objecting party, the court may demand a satisfactory racially neutral reason for the exercise of the challenge, unless the court is satisfied that such reason is apparent from the voir dire examination of the juror. Such demand and disclosure, if required by the court, shall be made outside of the hearing of any juror or prospective juror.
If the challenger makes a prima facie showing of discriminatory strikes, the burden shifts to the opposing party to offer racially-neutral explanations for the challenged members. The neutral explanation must be one which is clear, reasonably specific, legitimate, and related to the particular case at bar. State v. Collier, 553 So.2d 815, 820 (La.1989). If a race neutral explanation is tendered, the trial court must decide, in step three of the Batson analysis, whether the challenger has proven purposeful discrimination. Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995).
During voir dire of the second jury panel, Mrs. Snyder stated that she lived in LaPlace, that she was married, that she had children ranging in age from 35 to 41, that she was retired from Marathon Oil, and that her husband was retired from the St. John Parish water works department. She said she would be able to vote not guilty.
Mr. Jeandron stated that he lived in LaPlace, that he was married, that he had five children ranging in age from 15 to 49, that he was employed part-time with Allied Maintenance Training, and that his wife worked at First Baptist Church Wee Care Center as a teacher. He said that he did not think that all policemen always tell the truth, and that he would be able to vote not guilty.
The State accepted Mrs. Snyder as a juror, but defense counsel used a peremptory challenge to exclude her from the jury. The court commented that it was the eighth (peremptory) challenge by the defense. The court subsequently tendered Mr. Jeandron to the State. The State indicated that Mr. Jeandron was acceptable, but defense counsel used a peremptory challenge. The State said that this was the ninth white juror that had been peremptorily challenged, and that it thought that this violated the Batson ruling. The court told defense counsel that he needed to respond to the nine challenges.
Defense counsel explained that he did not like the lack of eye contact he received from Mr. Jeandron, that he did not "feel comfortable" with him with his lack of eye contact, and that he did not "feel comfortable" with the manner that he responded to questions. The State said that Mr. Jeandron responded "quite frankly." The *1022 court explained that this was not a proper way to exercise a peremptory challenge.
The trial court also told defense counsel that he needed to address the challenge of Mrs. Snyder, a white female. Defense counsel explained that she was a female with children, and that he felt "uncomfortable" with the fact that a female might be prejudiced against a young male defendant. The State responded that, in that case, they "should probably exclude ninety percent of this jury and not have jury trials in St. John Parish."
The trial court questioned defense counsel about other prospective jurors that he had challenged. When asked why he challenged Gary Beauchamp, defense counsel responded that Mr. Beauchamp's office prosecuted people.[2] With respect to another prospective juror, James Kliebert, defense counsel explained that he challenged Mr. Kliebert because he knew Officer Hidalgo.[3]
The court subsequently stated in pertinent part (footnote added):
Considering my remedy here, the Jeandron thing, I don't think that was properI have a hint that the Snyder and Jeandron [sic] are racially motivated. The first two have much more obvious reasons that would cause you to exercise a peremptory challenge.[4] So, therefore, I will strike the challenges of Snyder and Jeandron on Batson grounds, and not go back and address any other challenges you have exercised. In fact, those people have been dismissed and they are not within my purview.
The court then seated Mrs. Snyder as juror number five and Mr. Jeandron as juror number six. Defense counsel noted his objection.
The first step in the Batson analysis is whether the State established a prima facie case of discrimination. In connection with this first step, defendant contends that the State did not prove that defense counsel was engaging in purposeful discrimination. The record reflects that, after the State made a Batson challenge and accused defense counsel of using peremptory challenges to excuse white prospective jurors, the trial judge asked defense counsel to respond to the challenges.
Although the trial judge did not expressly rule that the State had established a prima facie case of discrimination, a trial judge's demand for race neutral justification for peremptory strikes is tantamount to a finding that enough evidence has been shown to support an inference of intentional discrimination. State v. Lewis, 01-155 (La.App. 5 Cir. 8/28/01), 795 So.2d 468, 472, writ denied, 01-2682 (La.8/30/02), 823 So.2d 939. Because it appears that the trial court found that the State made a prima facie showing of discriminatory strikes, the burden shifted to defense counsel to offer racially neutral explanations for the challenged members. The defendant argues that the trial judge erred by not accepting his reasons as race neutral.
*1023 Mr. Jeandron
The record indicates that defense counsel used a peremptory challenge on Mr. Jeandron because Mr. Jeandron failed to make eye contact with him, and because he was uncomfortable with the way Mr. Jeandron responded to questions.
This Court has previously found that trial courts have not abused their discretion in finding that failure to make eye contact is a racially neutral reason for peremptorily challenging a venireperson. See State v. Banks, 96-652 (La.App. 5 Cir. 1/15/97), 694 So.2d 401; and State v. Durham, 94-1036 (La.App. 5 Cir. 4/16/96), 673 So.2d 1103. However, this Court has also found that trial courts have not erred in refusing to accept failure to make eye contact as a race neutral explanation. See State v. Spencer, infra. Additionally, the comment that counsel has "a feeling" about a particular juror is not a sufficiently race neutral explanation. State v. Wade, 36,295 (La.App. 2 Cir. 10/23/02), 832 So.2d 977, 984, writ denied, 02-2875 (La.4/4/03), 840 So.2d 1213.
In State v. Spencer, 93-571 (La.App. 5 Cir. 1/25/94), 631 So.2d 1363, 1366-1367, writ denied, 94-0488 (La.2/3/95), 649 So.2d 400, the State, noting that the defendant was black, voiced an objection that the defense was using its peremptory challenges in a racially discriminatory fashion to exclude white jurors from the jury panel. The trial judge rejected defense counsel's reason for the peremptory challenge of one prospective juror who, according to defense counsel, avoided eye contact during questioning. This, along with quick responses to questions about the death penalty, argued defense counsel, indicated that this juror was less than candid and that he was predisposed toward the death penalty. The trial judge, who observed this veniremember during voir dire, refused to accept this explanation from defense counsel, and this Court found no manifest error in this ruling.
A reviewing court owes the district judge's evaluations of discriminatory intent great deference and should not reverse them unless they are clearly erroneous. State v. White, 01-134 (La.App. 5 Cir. 7/30/01), 792 So.2d 146, 153, writ denied, 01-2439 (La.9/13/02), 824 So.2d 1190. In the present case, with respect to Mr. Jeandron, the trial court did not believe that failure to make eye contact was a race-neutral explanation for challenging him. The trial judge carefully considered the matter and made a thoughtful decision based on his perceptions of the motivation of defense counsel during the voir dire. The trial judge had the advantage of observing the characteristics and demeanor of the attorneys and the prospective jurors firsthand, and he apparently believed that there was discriminatory intent for challenging Mr. Jeandron.
The record does not indicate that the trial court would not consider lack of eye contact to be a race neutral reason for a peremptory challenge in any situation. Rather, there was one instance during jury selection when defense counsel used a peremptory challenge on a prospective juror, Marlene Meades, who is a white female, and the State asserted a Batson challenge. Defense counsel explained that Ms. Meades failed to make eye contact, and the trial judge denied the State's Batson challenge, saying that he noticed Ms. Meades' failure to make eye contact himself. Therefore, the trial judge found that failure to make eye contact was a race neutral reason to exercise a peremptory challenge. However, he observed the voir dire and apparently did not believe that defense counsel's explanation was race neutral when Mr. Jeandron was challenged.
*1024 This Court has held that a trial judge's rulings regarding discriminatory jury selection are entitled to great deference, and are not overturned absent a finding of manifest error. State v. Spencer, supra at 1366-1367. Considering the record before us, particularly the transcript of jury selection, and in view of the vast amount of deference to be accorded to the findings of the trial judge in this context, it cannot be said that the trial judge was clearly wrong in choosing not to believe the explanation for challenging Mr. Jeandron and in granting the State's reverse-Batson challenge.
Mrs. Snyder
The record indicates that defense counsel used a peremptory challenge on Mrs. Snyder because she had children, and he was uncomfortable with the fact that a female might be prejudiced against his client, a young male.
It appears that one reason defense counsel was attempting to strike Mrs. Snyder was because of her gender. In J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 129, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), the Supreme Court extended Batson's prohibition to gender, holding that "gender, like race, is an unconstitutional proxy for jury competence and impartiality." 511 U.S. at 129, 114 S.Ct. 1419. However, in the instant case, the State did not object on the basis of gender and, therefore, the trial court made no ruling on that issue for this Court to review.
In addition to gender, defense counsel attempted to strike Mrs. Snyder because she had children. In State v. Harris, 01-0408 (La.6/21/02), 820 So.2d 471, 476, the State proffered that it was striking venireperson Brown because he was single and had no children. The Louisiana Supreme Court found that this justification was unpersuasive as the record reflected that the State did not attempt to strike single white male venirepersons without children. Similarly, in the instant case, defense counsel's claim that he was challenging Mrs. Snyder because she had children appears pretextual, considering that defense counsel had previously accepted a male with children during the voir dire of the first panel.[5]
In the instant case, it further appears that defense counsel attempted to strike Mrs. Snyder because of her advanced age. Although Mrs. Snyder's age is not in the record, it can be inferred that she was older than the defendant. The record indicates that the defendant was 35 years old at the time of trial, that Mrs. Snyder had children ranging in age from 35 to 41, and that defense counsel wanted to exclude her from the jury because she might be prejudiced against his "young" male client.
Considering the testimony, evidence and pertinent law, we find that the trial court did not err in finding that the defendant's explanations were not race neutral and in granting the State's reverse-Batson challenge with respect to Mrs. Snyder.
In view of the great deference to be accorded to the findings of the trial judge in this context, it cannot be said that the trial judge was clearly wrong in choosing not to believe the explanations for challenging Mr. Jeandron and Mrs. Snyder and in finding that purposeful racial discrimination motivated the peremptory challenges. Accordingly, the defendant's first assignment of error is without merit.
*1025 In his second assignment of error, the defendant argues that the trial court erred in denying his motion to appoint a sanity commission.
On April 30, 2001, defense counsel filed a motion to determine sanity. In that motion, defense counsel stated that it had just come to his attention that the defendant had a documented history of paranoid schizophrenia, that the defendant had been treated at Charity Hospital and diagnosed as a paranoid schizophrenic, and that the defendant had been prescribed drugs for treatment of that condition. Defense counsel noted that he was having difficulty communicating with his client and, therefore, in preparing for trial.
On that same date, the defendant and his counsel appeared in court for trial. The trial judge asked the defendant whether he understood that his trial was that day. The defendant said that he did not come to court with the understanding that his trial was that day, and that he thought he was coming to court to be able to speak to the judge. The trial judge said that it was not unusual for a defendant to think that. The defendant stated that he had not had the opportunity to talk to his attorney about the case.
The trial judge indicated that he thought the defendant's allegation that he had not spoken to his attorney was "a complete fabrication." The defendant subsequently admitted to the trial judge that he had talked to his attorney that day. Defense counsel stated that he had talked to the defendant and that now the defendant wanted to talk to the trial judge. The trial judge said that it was not his policy to talk to the defendants on the day of trial, that the jury was going to come in a few minutes, and that they would proceed with a felony trial. At that point, the prospective jurors entered the courtroom, were sworn, and voir dire commenced. After several panels of prospective jurors were questioned, 12 jurors and two alternates were sworn.
On May 11, 2001, approximately 10 days after the trial had been completed, the trial court filed a written judgment, denying the motion to appoint sanity commission. In that judgment, the trial court found that the defendant's self-serving statement that he had a history of mental illness, without any supporting evidence, offered moments before trial, did not satisfy the defendant's burden of demonstrating reasonable grounds to doubt the defendant's capacity.
In support of its position, the trial court cited State v. Washington, 00-301 (La.App. 5 Cir. 9/26/00), 769 So.2d 1235, 1238, writs denied, 00-2971 (La.9/28/01), 798 So.2d 106, 00-3041 (La.9/28/01), 798 So.2d 108, writ granted on other grounds, 02-1316 (La.5/31/02), 816 So.2d 863, in which this Court set forth the pertinent law regarding competency issues (Citations omitted):
According to La.C.Cr.P. art. 641, "[m]ental incapacity to proceed exists when, as a result of mental disease or defect, a defendant presently lacks the capacity to understand the proceedings against him or to assist in his defense." A defendant's mental incapacity to proceed may be raised by the defense, the district attorney, or the court at any time.
The law presumes a defendant's sanity. A defendant has the burden of proving by a preponderance of the evidence that, as a result of a mental disease or defect, he lacks the capacity to understand the proceedings against him or to assist in his defense. The trial court is required to order a mental examination of the defendant only when it has reasonable grounds to doubt the defendant's *1026 mental capacity to proceed. The ordering of a sanity commission rests in the sound discretion of the trial court. Furthermore, when the issue of a defendant's incapacity to proceed is presented by "bare allegations without supporting evidence, the exercise of discretion conferred on the trial judge will not be disturbed."
In State v. Washington, supra at 1237-1239, defense counsel orally requested on the day of trial that the trial court appoint a sanity commission to determine the defendant's present mental capacity. Defense counsel argued that the sanity commission was warranted because of certain responses on the intake booking sheet, and because the defendant had recently indicated he was taking certain medications.
This Court noted that the defendant did not present any medical or testimonial evidence in support of his motion, nor did he request a hearing on the motion. It also noted that the defendant conversed intelligently with the trial court and defense counsel at various stages of the proceedings. Accordingly, this Court concluded that the trial court did not abuse its discretion in denying the motion, and that defense counsel did not meet his burden of proof of calling the defendant's ability to proceed into question.
The defendant argues that the instant case differs from Washington because there was no hearing in Washington, whereas in this case, there was a hearing in which the defendant's claim that he had competency issues was corroborated. The defendant asserts that his statements at the hearing were evidence of his inability to understand certain aspects of the criminal proceedings.
The defendant is correct that the defendant in Washington did not request a hearing. However, we find that Washington is still applicable to the instant case, because the defendants in both cases did not introduce any medical or other evidence in support of their motions.
The trial court also cited State v. Ellis, 555 So.2d 608 (La.App. 4 Cir.1989), in support of its denial of the defendant's motion to appoint sanity commission. In Ellis, supra at 609-610, after the jury was sworn and excused, defense counsel moved for a mistrial after informing the court that the defendant and his mother had just apprised him that defendant had a prior mental history, and that he had seen a psychiatrist. Defense counsel also argued that he had little time to prepare the defense, and that he needed time to investigate the insanity defense. The trial court denied the defendant's motion for a mistrial.
The appellate court noted that there was no evidence of the defendant's incapacity other than defense counsel's statements. It stated that such self-serving statements of a defendant and his mother in the form of hearsay did not provide reasonable grounds to doubt the defendant's capacity, and that the trial court did not abuse its discretion in denying the motion. The appellate court also found that the defendant's argument as to lack of time to prepare a defense was not persuasive, that he had not filed a motion to continue the case or a motion for a new trial, and that he raised the defendant's mental capacity without making any effort to support or develop the issue. Id. at 610.
The defendant contends that Ellis differs from the instant case. He asserts that in the instant case, unlike in Ellis, defense counsel did not wait until the jury was empanelled but raised the issue to the trial court the day prior to trial. It is true that the defendant moved for a sanity hearing before the jury was empanelled, rather than after, as was done in Ellis. *1027 However, that distinction is minor and irrelevant to the issue of whether the trial court in the instant case erred in denying the motion to appoint a sanity commission. In both cases, the defendants did not present any medical evidence in support of their motions. Contrary to the defendant's assertions, Ellis is similar to and applicable to the instant case.
In sum, the record indicates that there was no evidence introduced to support the defendant's allegations of mental incapacity, other than the statement by defense counsel in the motion to appoint sanity commission that the defendant had a documented history of paranoid schizophrenia. Further, the defendant's statements at the hearing do not support his allegation of mental incapacity to proceed, since the trial judge explained that the defendant's responses were typical of other defendants. Based on the foregoing, we find that the trial court did not abuse its discretion in denying the defense motion to appoint a sanity commission, and that defense counsel did not meet his burden of proof of calling the defendant's ability to proceed into question. Accordingly, this assignment of error is without merit.
In his third assignment of error, the defendant argues that his 47-year multiple offender sentence is constitutionally excessive. He alleges that the trial court erred in failing to comply with the provisions of LSA-C.Cr.P. art. 894.1. He contends that, although the trial court ordered a pre-sentence investigation (PSI), there was no mention in the record that the PSI was provided to the court for sentencing, or that the PSI was considered in the sentencing.
The defendant asserts that there were no aggravating factors to justify the harsh sentence, that some murderers and rapists get shorter sentences, that he was arrested peacefully, that there was no violence or threats made during the transaction, and that there were no allegations of weapons being involved in the transaction, or of the defendant being in possession of a weapon. The defendant notes that he is not a violent criminal who needs to be locked away from society for the rest of his life, but that he is a likely schizophrenic who needs psychiatric help and drug treatment which he will not likely receive in prison.
The defendant orally objected to the excessiveness of the sentence at the sentencing hearing, but he did not urge any specific grounds in support of his objection. Additionally, he failed to file a motion for reconsideration as required by LSA-C.Cr.P. art. 881.1. The failure to file a motion to reconsider sentence, or to state specific grounds upon which the motion is based, limits a defendant to a review of his sentence for constitutional excessiveness. State v. Hester, 99-426, p. 10 (La.App. 5 Cir. 9/28/99), 746 So.2d 95, 103, writ denied, 99-3217 (La.4/20/00), 760 So.2d 342.
The Eighth Amendment to the United States Constitution and Article I, § 20, of the Louisiana Constitution prohibit the imposition of excessive or cruel punishment. State v. Wickem, 99-1261 (La. App. 5 Cir. 4/12/00), 759 So.2d 961, 968, writ denied, 00-1371 (La.2/16/01), 785 So.2d 839. A sentence is constitutionally excessive, even if it is within the statutory limits, if it is grossly disproportionate to the severity of the offense or is nothing more than the needless and purposeless imposition of pain and suffering. Id. Three factors are considered in reviewing a trial court's sentencing discretion: 1) the nature of the crime, 2) the nature and background of the offender, and 3) the sentence imposed for similar crimes by the same court and other courts. State v. *1028 Watts, 99-311 (La.App. 5 Cir. 8/31/99), 746 So.2d 58, 64, writ denied, 99-2733 (La.3/24/00), 758 So.2d 145. The issue on appeal is whether the trial court abused its discretion, not whether another sentence might have been more appropriate. Id.
In the instant case, the defendant was convicted of distribution of cocaine and found to be a second felony offender. His sentencing exposure, as a result of the enhancement, was a minimum of 15 years to a maximum of 60 years. LSA-R.S. 40:967(B)(4)(b); and LSA-R.S. 15:529.1(A)(1)(a). Thus, his 47-year sentence fell within the upper limits of the sentencing range.
The trial judge gave the following reasons for sentencing:
Having considered all that has come into play this day and in consideration of the various mitigating and aggravating circumstances that were evident in the trial in this jurisdiction, it's my sentence today, after considering those factors as set forth in the Code of Criminal Procedure, with particularity I will not go into great detail at this time with the type of offense that particularly concerns me [sic]. The fact that it's a second offense in the same family, essentially an escalation of the offense being that the first one I believe was possession of a drug and now he's graduated to distribution in this offense [sic].
The defendant states in his brief that the trial court ordered a PSI that was returnable on August 21, 2001, but that there was no mention in the record that the PSI was provided to the court for sentencing, nor any mention that the trial judge considered the PSI prior to sentencing. The record reflects that the trial judge ordered the Department of Corrections to conduct a pre-sentence investigation and to forward the PSI report to the court no later than August 21, 2001. The record does not reflect that the trial judge received or reviewed the record. However, the defendant did not bring this issue to the trial court's attention at sentencing. Accordingly, this issue has not been preserved for appellate review. LSA-C.Cr.P. art. 841.
The record reflects that the defendant had a previous conviction for possession of cocaine, and that the conviction for distribution of cocaine, the underlying offense, showed an escalation of the defendant's behavior. Furthermore, the videotape of the incident and the matchbox providing the defendant's phone number to the undercover officer indicate that the transaction involved in this case was not one isolated incident of drug distribution. Although there have been cases where defendants in similar situations have received lighter sentences, the sentence imposed by the trial court was within the statutory range and was 13 years less than the maximum he could have received. Considering the record before us and the great discretion afforded to a trial judge in sentencing, we cannot say that the trial court abused its discretion in sentencing the defendant as a second felony offender to 47 years at hard labor. Accordingly, this assignment of error is without merit.
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). The review reveals one error requiring corrective action.
The trial judge informed the defendant that he had two years in which to file a petition for post-conviction relief; however, he stated that the time would begin to run "when the sentence of the judgment becomes final." LSA-C.Cr.P. art. 930.8 provides that no application for post-conviction relief, including applications *1029 which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final.
We are unable to ascertain whether the trial court incorrectly informed the defendant of the time when the prescriptive period for post-conviction relief begins to run or whether the transcript simply contains a typographical error. In an abundance of caution, we remand the case and order the trial court to inform the defendant of the provisions of LSA-C.Cr.P. art. 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of this opinion and to file written proof that the defendant received the notice in the record of the proceedings.
DECREE
For the reasons set forth above, we affirm the defendant's conviction and sentence. We remand the matter and order the trial court to send written notice to the defendant of the prescriptive period for filing post-conviction relief.
AFFIRMED; REMANDED WITH INSTRUCTIONS.
EDWARDS, J., concurs in part and dissents in part.
EDWARDS, J., concurs in part and dissents in part.
I concur in the majority opinion affirming Stewart's conviction. However, I respectfully disagree from the majority opinion which finds no excessiveness in Stewart's sentence of 47 years as a second felony offender.
This Court has previously affirmed sentences in the lower range for defendants in similar cases, where a defendant's conviction for distribution was preceded by a conviction for simple possession. See State v. Anderson, 01-789 (La.App. 5 Cir. 1/15/02), 807 So.2d 956; writ denied, XXXX-XXXX (La.1/24/03), 836 So.2d 42. Even taking into account the trial court's finding that Stewart's second conviction was an "escalation" of an offense within the same "family" of drug offenses, I find that a lesser sentence was warranted under the facts of the present case.
NOTES
[1] Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
[2] During voir dire, Mr. Beauchamp stated that he was an Assistant Attorney General for the Louisiana Department of Justice. It is noted that defense counsel used his seventh peremptory challenge on Mr. Beauchamp.
[3] During voir dire, Mr. Kliebert stated that he knew Detective Troy Hidalgo through the Krewe of DuMonde, a carnival club, that he had known Detective Hidalgo for approximately three years, but that he could still be impartial. It is noted that defense counsel used his sixth peremptory challenge on Mr. Kliebert.
[4] It appears that the court here is referring to Mr. Beauchamp and Mr. Kliebert.
[5] Colbert Cole stated that he had three children, ages 3, 9, and 16. It is unclear from the record whether Mr. Cole was white or black.