981 So.2d 214 (2008)
STATE of Louisiana
v.
Johnathan MYERS.
No. 07-KA-854.
Court of Appeal of Louisiana, Fifth Circuit.
April 29, 2008.
Rehearing Denied May 19, 2008.
*218 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Thomas J. Butler, Tonia Williams, Assistant District Attorneys, Twenty-Fourth Judicial District, Parish of Jefferson, Gretna, LA, for Plaintiff/Appellee.
Katherine M. Franks, Louisiana Appellate Project, Abita Springs, LA, for Defendant/Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, JR., THOMAS F. DALEY, and FREDERICKA HOMBERG WICKER.
THOMAS F. DALEY, Judge.
Defendant, Johnathan Myers, appeals his conviction of forcible rape, a violation of LSA-R.S. 14:42.1. On appeal, he argues that the trial court erred in refusing to allow the admission into evidence of a videotape depicting consensual sex between Myers and the victim. He also argues that his sentence was excessive and ineffective assistance of counsel in three different aspects. For the following reasons, we affirm defendant's conviction, and remand with instructions.
FACTS
J.S.,[1] the victim, testified at trial that she is a divorced mother of two young children. She works as a veterinary technician. J.S. testified she was romantically involved with defendant, Johnathan Myers, from June, 2005 until February 28, 2006. Starting in July, 2005, the two lived together with J.S.'s children in her home in Waggaman. According to J.S., she was the one who ended the relationship. She told defendant to take his belongings and leave her house.
J.S. testified that during their relationship, she and defendant frequently engaged in consensual sexual intercourse. After the relationship ended, J.S. maintained friendly communications with defendant. The two occasionally talked on the telephone, and defendant sometimes visited J.S.'s house to work on the car J.S. allowed him to keep there. J.S. had consensual sex with defendant one time in March, 2006, and once in May, 2006. She testified that she made it clear to defendant that these sexual encounters did not signal a resumption of the relationship.
Defendant telephoned J.S. at about 9:00 p.m. on July 26, 2006. He asked her to take him back. She repeatedly refused. Defendant began asking J.S. personal questions about her current dating relationship. He seemed upset that she was seeing someone else. He asked her about her sexual relationship with her new boyfriend. J.S. told him her personal life was none of his business. Defendant repeatedly said he wanted to go to J.S.'s house, and she told him "No."
*219 When their telephone conversation ended, J.S. went outside to watch for defendant. She was concerned that he would come there uninvited, and she wanted to keep him from getting inside her house, where her children were sleeping. J.S. telephoned a friend and asked her to come to her house.
J.S. testified that she was still standing in front of her house between midnight and 1:00 a.m. when defendant arrived there. He walked past her and into the house. She followed him inside, because she did not want him to be there alone with her children. J.S.'s friend arrived, and J.S. went outside and told her defendant was there, and that she was afraid of him. She told her friend to leave because she did not want defendant to become angry.
J.S. went back inside and she and defendant sat in the living room. Defendant asked her questions about the man she was dating. He wanted to know whether she had had sex with him. She did not answer his questions. Defendant asked J.S. to have sex with him one last time. When she refused, defendant insisted that she was going to have sex with him. Defendant repeated several times that he was going to f* *k her, and J.S. continued to tell him no. J.S. testified that she felt scared because defendant was acting mean and weird. She worried about what he would do to her.
J.S. said defendant locked the front door of the house. He told J.S. "you're going to f* *k me." She told him "no." Becoming angry, J.S. stomped her foot and told defendant to leave. Defendant told her to shut up. He told her that if she woke her children, he would kill her in front of them. J.S. said defendant spoke in a low, menacing tone.
J.S. testified that she sat on the couch while defendant paced back and forth, grabbing his head and saying to himself, "What are you doing" and "You told yourself you weren't going to act like this." J.S. testified that his behavior frightened her. Defendant got on top of her and grabbed her by the throat. He told her to shut up or he would kill her. Defendant grabbed J.S.'s hair and dragged her into her bedroom. He closed and locked the door. He kept telling her to "shut up." J.S. said she tried to think of a way to get herself and her children out of the house and away from defendant.
J.S. did not say anything at that point, fearing she would wake her children. Defendant put her on the bed, pulled down her pants, and penetrated her vagina with his penis. Defendant was hurting her, so she put her hand back. Defendant told her, "Don't f* *king touch me b* *ch; I'll kill you. I'll punch you in the face." She then brought her hand forward again.
Still holding onto her hair, defendant ordered J.S. to "suck his dick." Defendant continued to grip J.S.'s hair as she performed oral sex on him. Defendant then bent J.S. over the bed, face-down. He then put his hands on the back of her neck and pushed her hard into the bed. He penetrated her "butt" with his penis. Defendant then wiped off his penis and inserted it into the victim's vagina. J.S. testified that defendant continued to alternately penetrate her mouth, her vagina, and her "butt," all the time holding her hair. At one point, defendant took a "toy" from under the bed and inserted it into J.S.'s "butt" while he penetrated her vagina with his penis. J.S. testified that defendant ejaculated into her vagina.
J.S. said defendant continued the sexual assault for two hours. Whenever she cried out in pain, defendant told her to shut up. He continued to tell her he would kill her in front of her children.
*220 J.S. testified defendant went into the bathroom. He then reentered the bedroom and sat on the edge of the bed. J.S. went into the bathroom and cleaned herself. Defendant left her house at about 5:30 a.m. J.S. testified that at no point during the course of the incident did she consent to have sex with defendant.
J.S. put the soiled sheets from her bed and the towels defendant had used in the bathroom into a laundry basket in her garage. She was afraid to report the assault to the police because defendant had told her he would kill her if she had him put in jail. At the same time she was afraid that if she did not report the attack, defendant would return.
J.S. testified that she experienced soreness in her "butt," vagina, legs, neck, and head. She nevertheless took her son to day care and her daughter to summer camp that morning. She then telephoned her best friend, Yolanda Gros, and arranged to meet her at Gros' home in Gretna. When J.S. arrived at Ms. Gros' house, she told her friend that defendant had come to her house the preceding night, ostensibly to talk to her, but that he had turned ugly and raped her.
Ms. Gros testified that J.S. moved very slowly when she got out of her car; like someone who was suffering from severe sunburn. She also observed that J.S.'s face looked puffy, as if she had been crying or had been hit. J.S. told her in a whispering tone what defendant had done to her. Gros testified that J.S. wanted to report the incident to the police, but that she was afraid to do so. Gros called 9-1-1 herself. An officer with the Gretna Police Department responded.
Deputy Michael Newell of the Jefferson Parish Sheriffs Office (JPSO) testified that the rape call was referred to him by the Gretna Police at about 8:00 a.m. on July 27, 2006. He spoke to J.S. at Ms. Gros' house on Hero Court. J.S. appeared upset, and her eyes were red, as if she had been crying. She told Deputy Newell that her former boyfriend had raped her at her residence in Waggaman. Deputy Newell had the victim drive to her home, and he followed in his car.
Deputy Newell testified that he had crime scene investigators come to J.S.'s house to collect evidence and to photograph the scene.[2] Photographs were taken of the victim to show the marks defendant allegedly made on her neck during the incident.
The deputy testified that J.S. identified the perpetrator as Johnathan Myers. The victim told him defendant was working at the Family Dollar Store at 2800 Highway 90. Deputy Newell went to the store, advised defendant of his Miranda[3] rights, and placed him under arrest. Defendant was agitated and verbally defiant, but he did not resist arrest.
Detective Michael Holohan of the JPSO's Personal Violence Section conducted the follow-up investigation. He went to the victim's residence in Waggaman at about 8:30 a.m. on July 27, 2006 and met with her and Deputy Newell. Detective Holohan testified that J.S. was crying, shaking, and upset as she described how defendant had raped her. The victim told him defendant had dragged her into her bedroom by her hair, and he had raped her vaginally, anally, and orally. Detective Holohan referred J.S. to Lakeside Hospital in Metairie for a rape examination. *221 The detective then met with defendant in an interview room at the JPSO Detective Bureau and advised him of his rights. Defendant declined to make a statement.
The trial court accepted Dr. Rachel Reitan as an expert in the field of obstetrics and gynecology. Dr. Reitan conducted a rape examination on J.S. at Lakeside Hospital. The doctor testified that she first encountered J.S. in the emergency room. J.S. was sitting on the bed in a modified fetal position, with her eyes down. The victim was crying continuously, and her eyes were red and swollen. Dr. Reitan's first impression was that J.S. was traumatized.
The doctor first took a medical history from J.S., and then conducted the physical examination. J.S. told her that her ex-boyfriend had repeatedly raped her in her mouth, her anus, and her vagina. The victim sobbed intermittently as she gave her account of the incident.
Prior to the doctor's examination, a nurse collected specimens from J.S., including fingernail scrapings, hair from her head, and pubic hair. Dr. Reitan found J.S. had no outward bruising or lacerations, but she noted some redness around the victim's neck. The doctor testified that J.S. had no vaginal or cervical lacerations, but the victim's vaginal and rectal areas were very red and tender. There was semen in the vaginal bowl, the back part of the vagina. Dr. Reitan collected some semen for DNA testing.[4] She also did cultures to test for sexually transmitted diseases.
On cross-examination, the doctor testified that violent sex would not necessarily cause vaginal tears (i.e., cuts). One usually sees tears in children or in adult women who have not had intercourse or who have not given birth. In the instant case J.S. had a great deal of redness and a lot of pain. The doctor opined that the redness came from irritation or rubbing.
Defendant testified at trial that he met J.S. in June, 2005. At that time defendant worked with J.S.'s husband at Avondale Shipyards. Defendant said he and J.S. began living together right away. They had a very active sex life, which included vaginal, anal, and oral sex. Their relationship lasted until February 28, 2006, at which time defendant moved into his grandmother's house around the corner from J.S.'s residence.
According to defendant, the two remained in contact after the breakup. He frequently visited J.S. and her children at their house. He and J.S. had consensual sexual relations about once or twice a week. In June, 2006, he and J.S. had sex three times a week, and in the first two weeks of July, 2006, they had sex once.
Defendant testified that he telephoned J.S. on the night of July 26, 2006. The two conversed about their jobs. During their conversation defendant took an incoming call from a woman he had been seeing. When J.S. learned the woman had telephoned defendant, she invited him to her house. Defendant surmised that J.S. invited him to her home because she was afraid that he would go to see the woman who had called him.
Defendant testified that he arrived at J.S.'s house at about 12:15 a.m. that night. In the past J.S. had routinely invited him to her house after her children were asleep in order to have sex with him. He assumed that was her motive for inviting him there that night. For a while defendant and J.S. sat and talked in the living room, and he used her computer to access his e-mail. J.S.'s friend, Katy stopped by *222 briefly with her (Katy's) brother, and J.S. visited with them outside the house while defendant stayed inside. J.S. then went back inside the house and locked the front door.
Defendant testified that he and J.S. sat on the couch and talked for a while. They hugged and kissed, and then they went into J.S.'s bedroom. They engaged in oral, anal, and vaginal sex. The sexual activity went on for about two hours. Defendant said he did not use force or threats against J.S., and she never told him she did not want to have sex with him. The sexual encounter was consensual. Defendant testified that he believes J.S. has pursued rape charges against him because she is afraid of losing him, and if she cannot have him, she does not want any other woman to have him.
Louise Weathersby, defendant's maternal grandmother, testified that defendant divided his time between her house and J.S.'s house during his relationship with J.S. Sometime around Mardi Gras of 2006, defendant moved his belongings back into Ms. Weathersby's house. She did not ask him what had happened between him and J.S. Even after that, J.S. and her children went to Ms. Weathersby's house, and defendant went to J.S.'s house. Ms. Weathersby testified that at the time of defendant's arrest, he and J.S. were still seeing each other almost daily.
Rosemary Myers, defendant's paternal grandmother, testified that she raised defendant for several years when he was a child. She said she had never met J.S., but that she met J.S.'s children once when he brought them to her house.
ASSIGNMENT OF ERROR NUMBER ONE
Defendant's defense at trial was that J.S. consented to have sexual relations with him on July 27, 2006. He argues that he was deprived of his constitutional right to present a defense when the trial court refused to admit a videotape that depicted him and J.S. engaging in consensual sex in December, 2005. The State responds that the trial court did not err in suppressing the videotape because its content was offensive and lacked probative value.
On May 2, 2006, the State filed a Motion in Limine seeking to prevent the defense from introducing the videotape at trial. On May 3, 2006, defendant filed a motion to introduce said videotape, asking that the trial court conduct an in camera inspection of its contents. The trial court took up those motions on May 7, 2006.
The trial judge noted that, in lieu of showing the videotape to the jury, the State was offering a stipulation that defendant and J.S. had a prior sexual relationship, which included the acts that were recorded in December of 2005. The judge further noted that, although she had not viewed the videotape, she understood it to show the victim performing oral sex on defendant as well as the couple engaging in vaginal sex from the rear. The trial court ruled:
Okay. So based on the stipulation now of the State that we will instruct the Jury as to that, I am going to deny the viewing of the videotape between a victim and the Defendant having sex; because I believe it adds nothing further to Defense's case, other than pornography. And I don't think the Jury needs to see it. They're going to understand that there was prior sex between the Defendant and the victim. I think that goes to the Defense's theory of the case.
They're going to be told that. And I think to view it would serve no probative value; and it would be probably prejudicial to some Jurors, and offensive. And the only thing it does is add porn to the Trial. And I don't think that should be *223 admissible. You have a victim here, and I don't think consensual sex tapes should be shown to a Jury.
And also I'm considering the fact that the State is going to maintain that they had a prior sexual relationship.
The trial court addressed the matter again before the commencement of trial proceedings on May 9, 2006. The judge noted that the State and the defense had agreed to stipulate before the jury to the existence of the tape and to its contents. The judge reiterated that she would not allow the tape to be introduced at trial. She commented, "I think to show the video is inflammatory. It adds nothing to the Trial other than a pornography effect. And we're not having pornography in this courtroom." Defense counsel argued that the judge had not viewed the videotape. The judge agreed to do so during a break in the trial.
J.S. testified on cross-examination that in the course of their dating relationship, she and defendant videotaped themselves having consensual vaginal, oral, and anal sex. The defense offered the December, 2005 videotape as evidence, and the trial court denied the offering, ruling that the defense had not laid a sufficient foundation for the tape's admission. The judge told defense counsel he could try again to lay a foundation for the tape when defendant took the stand. At that point the parties stipulated that defendant and victim videotaped themselves having consensual oral sex, penile-vaginal sex, rear entry vaginal sex, and digital-anal sex. The parties further stipulated that the tape was made in December, 2005, while defendant and J.S. were in a dating relationship. The judge again agreed to watch the videotape to determine whether it could be shown to the jury.
Later in the trial, out of the jury's presence, the judge stated she had viewed the videotape, and that she stood by her original ruling denying its admission. She stated, "I think it is vile. I think it is porn. And I don't think this Jury would at all be interested in it. I also think that in light of the stipulation that we have; it adds no probative value to this case at all." At the end of trial, the court allowed defense counsel to make a proffer of the videotape.
Defendant now argues the trial court's refusal to allow the admission of the sex tape deprived him of the opportunity to show the jury that the sex acts he and J.S. engaged in on July 27, 2006 were typical of the consensual sex they had engaged in throughout their dating relationship. Defendant further argues that if the jury had been allowed to watch the videotape, they would have seen that he was so large in size relative to the victim that if he had used force on her she would have sustained injuries greater than those found by Dr. Reitan. For the reasons that follow, it does not appear that the trial court erred in suppressing the videotape at issue.
Both the Sixth Amendment to the United States Constitution and Article I, § 16 of the Louisiana Constitution guarantee a criminal defendant the right to present a defense. But this right does not require a trial court to permit the introduction of evidence that is irrelevant or has so little probative value that it is substantially outweighed by other legitimate considerations in the administration of justice.[5] Relevant evidence is defined by LSA-C.E. art. 401 as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable *224 than it would be without the evidence." Irrelevant evidence is inadmissible. LSA-C.E. art. 402.
LSA-C.E. art. 412(B)(2) provides that, upon compliance with the pre-trial procedure set forth in art. 412(C), evidence of past sexual behavior with the accused offered by the accused upon the issue of whether or not the victim consented to the sexually assaultive behavior is admissible. In this case, the defendant complied with art. 412(C) by filing his Motion in Limine and providing the tape to the court and the state. State v. Everidge, 96-2665 (La.12/2/97), 702 So.2d 680, 683-84 (La. 1997).
In State v. Myles, 04-677 (La.App. 5 Cir. 1/25/05), 894 So.2d 515, 524-25, the defendant appealed his conviction for carnal knowledge of a juvenile. This court held that evidence of past sexual behavior with the defendant regarding whether the victim consented to the sexually assaultive behavior was not relevant, because both parties admitted the encounter was consensual. This is not the case here. Thus, the tape was relevant to Myers' defense that J.S. consented to have sex with him on July 27, 2006. LSA-C.E. art. 412(B)(2).
Furthermore, the December 2005 videotape that was made roughly seven months before the July 2006 disputed encounter was not so remote in time as to lack probative value. J.S. admitted that she continued to have consensual sex with Myers a total of two occasions in March and May 2006. Thus, the consensual sex depicted on the December 2005 videotape was not an isolated and outdated encounter.
However, under LSA-C.E. art. 403, while relevant, the tape was properly excluded because its probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury. See State v. Mosby, 595 So.2d 1135, 1136 (La.1992).
Given the substantial evidence admitted concerning the nature of the sexual relationship between Myers and J.S., the tape was cumulative of admitted evidence. See La.C.E. art. 403, which provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." (Emphasis added). Compare: State v. Kelly, 01-0124 (La.6/29/01), 791 So.2d 1286, 1287 (per curiam) (holding that probative value of other crimes evidence in the form of testimony from 15 non-victim witnesses was substantially outweighed by the danger of unfair prejudice in prosecution for indecent exposure to juveniles as such testimony was cumulative to three other witnesses).
Furthermore, the tape, which was eventually viewed by the trial judge, is extremely graphic. Given its nature, the tape would tend to overwhelm, mislead and confuse the jury.
To summarize, the tape was relevant and admissible. Having said this, a LSA-C.E. art. 403 analysis was proper and appropriate. Here, where the parties' prior consensual relationship was not contested, where the parties testified regarding specifics of their sexual behavior during that relationship as well as the duration of the relationship, and where the parties stipulated to the existence and basic contents of the consensual videotape, the probative value of the tape itself was minimal, juxtaposed by its graphic content, which was in danger of overwhelming the jury. Therefore, we find no error in the exclusion of the videotape under an art. 403 analysis.

*225 ASSIGNMENT OF ERROR NUMBER TWO

Defendant argues that his 20-year sentence for forcible rape is excessive in view of the facts of the case and his lack of a criminal history. Defendant also complains that the trial judge failed to articulate reasons for the sentence imposed. The State responds that the sentence is well within the sentencing range established by LSA-R.S. 14:42.1, and that it is not grossly disproportionate to the offense. The State further argues that defendant may not complain of the trial court's failure to issue detailed reasons for sentencing because he did not preserve the issue for appeal.[6]
On June 26, 2007, defendant filed a timely pro se Motion for Reconsideration of Sentence. On July 5, 2007, the trial court issued an Order denying defendant's Motion, finding that it had been divested of jurisdiction over the case. Defendant applied for supervisory writs to this Court from the trial court's ruling. This Court granted writs, noting that LSA-C.Cr.P. art. 916 C authorizes the trial court to rule on a Motion to Reconsider Sentence following the entry of an order of appeal. This Court remanded the case for a ruling on the merits of defendant's pro se motion.[7] On August 13, 2007, the trial court again denied defendant's Motion to Reconsider Sentence.
As the State notes, defendant did not object at the time of sentencing to the trial court's failure to articulate specific reasons for sentencing under LSA-C.Cr.P. art. 894.1(C).[8] Defense counsel simply objected to the 20-year term as excessive because he was a first offender, and did not make any further argument. But defendant did file a timely pro se Motion for Reconsideration of Sentence below. It does not appear that defendant raised the issue in his pro se motion so as to preserve it for appeal. Even assuming defendant is entitled to review of his Article 894.1 argument, the argument has no merit.
Article 894.1(C) requires the trial judge to state for the record the considerations taken into account and the factual basis when imposing the sentence. But when there is an adequate factual basis for the sentence contained in the record, the trial court's failure to articulate every circumstance listed in LSA-C.Cr.P. art. 894.1 does not require a remand for re-sentencing.[9] In the instant case, it appears the record provides an adequate factual basis for the sentence imposed. (See the discussion of facts supporting the sentence, below).
Regardless of whether he preserves specific sentencing issues for appeal, a defendant is entitled to a review of his sentence for constitutional excessiveness. The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. A sentence is considered excessive, even when it is within the applicable statutory range, if it is grossly disproportionate to *226 the offense or imposes needless and purposeless pain and suffering.[10]
In reviewing a sentence for excessiveness, the appellate court must consider the punishment and the crime in light of the harm to society and gauge whether the penalty is so disproportionate as to shock the sense of justice. The trial judge is afforded wide discretion in determining sentence, and the court of appeal will not set aside a sentence absent a clear abuse of the trial court's discretion.[11] Accordingly, the relevant question on appeal is whether the trial court abused its broad sentencing discretion, and not whether another sentence might have been more appropriate.[12]
The sentencing range for forcible rape is five to 40 years, the first two of which must be served without benefit of parole, probation, or suspension of sentence. LSA-R.S. 14:42.1 B. Defendant received a mid-range sentence.
The trial court took into account J.S.'s victim impact statement, in which she said the rape had caused her and her children to feel unsafe in their own home. J.S. further stated that defendant
will never know what it is to have something so precious taken from you, something that is only my choice to give. To be so threatened and violated by another, to be treated like my body is not my own, to be treated like you are a possession and not really a person, to be so scared of someone and feeling that you are going to die at any moment at the hands of someone who once said they loved you.
Defendant was also allowed to make a statement to the court prior to sentencing. He denied that he was guilty of rape, and he accused the victim of having given perjured testimony at trial. He complained that he had been the victim of racism because he was an African-American man accused of raping a white woman. He further maintained that his rights had been violated, and that the jury's verdict was contrary to the evidence at trial. He showed no remorse, and he accepted no responsibility for his actions.
While defendant has no prior felony convictions, the testimony at trial showed defendant's actions were particularly offensive. He committed the rape in the victim's home while her young children slept nearby. When the victim attempted to resist, defendant threatened to kill her in front of her children. Defendant penetrated the victim repeatedly over a period of two hours in such a manner as to cause her pain. Defendant held the victim's neck with such force that he left red marks there.
In State v. Collins,[13] the Third Circuit found, under facts similar to those in the instant case, that the defendant's 30-year sentence for forcible rape was not constitutionally excessive. The victim in that case testified that the defendant gained access to her apartment under the pretense of using her telephone. He then choked her and ordered her to perform oral sex on him while her eight-month-old daughter slept nearby. He threatened to kill her if she did not comply. According to the *227 defendant, the victim had invited him into her apartment, and the sex was consensual.
In finding the defendant's sentence was not excessive, the court of appeal reasoned:
The trial court heard the victim's testimony that the defendant had used physical force and threats to rape her and force her to perform oral sex on him in her home while her daughter slept a few feet away. Based on the conflicting testimony of the victim and the defendant, the jury accepted the victim's account in assessing whether the encounter was consensual, and the trial court considered the same evidence in determining the defendant's sentence.
While the sentence is at the higher end of the sentencing range for forcible rape, we do not find that the sentence shocks our sense of justice or that the punishment is grossly disproportionate to the severity of the crime committed. The sentence imposed upon the defendant was within the statutory sentencing range for forcible rape and we find no manifest abuse of the trial court's discretion in imposing this particular sentence.[14]
See also State v. Reaves,[15] in which the Second Circuit upheld the defendant's 25-year sentence for forcible rape where the defendant gained entry into the victim's home by asking to use her telephone, and then raped her at knifepoint. The court of appeal took note of the emotional toll the incident had taken on the victim, and the fact that defendant showed no remorse for his actions.
Based on the foregoing, the defendant's sentence is not grossly disproportionate to the offense. The trial court did not abuse its broad discretion in imposing a 20-year term.

ASSIGNMENT OF ERROR NUMBER THREE
Defendant complains that his trial counsel was ineffective in three respects:
a. Counsel failed to object to the prosecutor's impermissible use of Johnathan Myers['] exercise of his right to remain silent, leaving the jury with the prosecutor's stated belief Mr. Myers' testimony was a recent fabrication, an inference rammed home by the prosecutor also without an objection or mistrial request.
b. Counsel failed to object when the examining physician was permitted, in response to the prosecutor's direct question, to opine as to the "truth" of J.S.'s allegations, an ultimate fact in the case.
c. Counsel failed to ask for reconsideration of the sentence as required by C.Cr.P. art. 881 so as to preserve direct challenges to the sentence for appellate review.
A claim of ineffective assistance of counsel is most appropriately addressed through an Application for Post-Conviction Relief rather than direct appeal, so as to afford the parties an adequate record for review.[16] Only when the record contains sufficient evidence to decide the issue and the issue is properly raised by assignment of error on appeal, may it be addressed in the interest of *228 judicial economy.[17] In the instant case, the record on appeal is sufficient to address the merits of defendant's claims.
Under the Sixth Amendment to the United States Constitution and Article I, § 13 of the Louisiana Constitution, a defendant is entitled to effective assistance of counsel. To establish a claim of ineffective assistance of counsel, a defendant must demonstrate: 1) that his attorney's performance fell below an objective standard of reasonableness under prevailing professional norms; and 2) that his counsel's errors or omissions resulted in prejudice so great as to deprive the defendant of a fair trial or a trial whose result is reliable.[18]
The Sixth Amendment does not guarantee errorless counsel or counsel judged ineffective by hindsight.[19] Ineffective assistance claims are assessed on the facts of the particular case as seen from the counsel's perspective at the time.[20] As such, there is a strong presumption that counsel's conduct will fall within the wide range of reasonable professional assistance.[21]
Defendant first complains that his trial counsel failed to object to the State's improper references to defendant's post-arrest silence. Defendant points to testimony the prosecutor elicited from Deputy Newell and Detective Holohan that defendant was advised of his Miranda rights at the time of his arrest and again when the detective met with him at the Detective Bureau, and that he did not make any post-arrest statements.
In Doyle v. Ohio,[22] the defendants were charged with selling marijuana. In their separate trials, each defendant claimed he was framed. The prosecutor attempted to impeach individually the defendants' credibility on cross-examination by asking them why they had not informed the arresting officer they were framed. On appeal, the defendants argued the State erred in using their silence to impeach their credibility at trial. The United States Supreme Court held that reference to a defendant's silence at the time of his arrest and after Miranda warnings for impeachment purposes violates the defendant's due process rights.[23]
This Court, in State v. Williams,[24] concluded that not every mention of a defendant's post-arrest silence is prohibited by Doyle. This Court found that Doyle only bars the use of the defendant's silence at the time of arrest and after his Miranda warnings for impeachment purposes. The State, therefore, cannot make a reference to an accused having exercised his constitutional right to remain silent after being advised of the right, solely to ascribe a guilty meaning to his silence or to undermine, by inference, an *229 exculpatory version related by the accused, for the first time at trial. Id. But an oblique or obscure reference to a defendant's post-arrest silence does not constitute reversible error when the examination does not stress the right to remain silent or attempt to elicit testimony regarding the defendant's failure to respond to police questioning. Id. Consequently, the State may pursue a line of questioning that attempts to summarize the extent of the investigation when the questions are not designed to use the defendant's failure to claim his innocence, after his arrest, to impeach his testimony or attack his defense.
The State elicited the following testimony from Deputy Newell:
Q. And after he was Mirandized and arrested, did he indicate anything else or make any other verbal statements?
A. No. He didn't have anything to say to us at all.
The next witness, Detective Holohan, described how he went over the waiver of rights form with Myers. The prosecutor asked him if the defendant made any statements, to which Detective Holohan replied "no."
We find that these references to the defendant's post-arrest silence were neither oblique nor obscure, and thus constitute a clear violation of Doyle. It is not clear what purpose these questions served.
Under LSA-C.Cr.P. art. 771, when the prosecutor or a witness makes a reference to a defendant's post-arrest silence, the trial court is required, upon the request of the defendant or the State, to promptly admonish the jury.[25] In such cases where the trial court is satisfied that an admonition is not sufficient to assure the defendant a fair trial, the court may grant a mistrial upon motion of the defendant.[26] The granting of a mistrial is within the discretion of the trial court if the trial court is satisfied that an admonition is not sufficient to assure the defendant a fair trial.[27] A brief reference to a defendant's post-arrest silence does not mandate a mistrial or reversal when the trial as a whole was fairly conducted, the proof of guilt is strong, and the prosecution made no use of the silence for impeachment purposes.[28]
The prosecutor did not dwell on the fact that defendant did not make any statements following his arrest in an attempt to impeach his credibility or to suggest that his silence was indicative of guilt. Counsel may have determined, as a part of trial strategy, that calling attention to the issue by asking for an admonition was not in defendant's bests interests. Moreover, defendant fails to show that he was prejudiced by his attorney's failure to act. The evidence of defendant's guilt, in particular the victim's testimony, was strong. It cannot be said that the result of this trial would surely have been different had defense counsel objected to this testimony.
Defendant next argues that his trial counsel was ineffective in failing to object to Dr. Reitan's improper opinion testimony as to the ultimate issue of fact in the case. He refers to the following exchange between the prosecutor and the doctor:

*230 Q. Based on the physical findings, upon your examination of [J.S.]; do you have an opinion as to whether or not she had sustained the sexual assault?
A. Yes. One of the things we look at specifically is in the consensual sexual act; the woman isn't going to be red and irritated on the outside of her vulva or her rectum like [J.S.] was. The woman's body goes through some physiological changes when she's having consensual sex. So the outside isn't going to be red and tender and swollen like her's [sic] was.
Specifically with anal intercourse; I could tell that she was traumatized in her anal area. Because when people usually do  well, when people have anal intercourse, they use a lubricant. The woman physiologically, you know, knowing that something is going to penetrate her anus, they have lubrications so that it's not red and swollen and irritated.
Her rectum definitely did not have any lubricant and definitely was red and irritated; like something had been forced into her rectum.
Same with the vagina. The vagina, you know, obviously no lubricant  was very irritated and traumatized.
Q. Do you have an opinion as to whether or not [J.S.] sustained that redness and tenderness to her anus and her vagina as a result of a sexual assault?
A. I have a very strong opinion that she was absolutely sexually assaulted, based on the evidence that I saw on her exam. Also based on her emotional being before, during and after the exam.
Defendant's argument is misplaced. A physician testifying as an expert may properly give an opinion as to the probable manner in which a wound or other traumatic injury was inflicted, where such testimony is based on facts within the knowledge of the witness.[29] Dr. Reitan did not express an opinion as to the ultimate issue of fact in this case, i.e., defendant's guilt or innocence. Rather, she gave an opinion as to whether the evidence she found in her physical examination of J.S. indicated the victim had engaged in non-consensual intercourse. As an expert in obstetrics and gynecology, the doctor was qualified to offer an opinion on that question. Thus, counsel was not deficient in failing to object to the line of questioning. Further, defendant does not show that he was prejudiced by the doctor's testimony.
Last, defendant argues that his trial counsel was ineffective in failing to raise mitigating circumstances at the time of sentencing, failing to request a pre-sentence investigation, and failing to file a Motion to Reconsider Sentence under LSA-C.Cr.P. art. 881.1, thereby limiting review of his sentence on appeal.
The Louisiana Supreme Court has held that a pre-sentence investigation is merely an aid to the court and not a right of the accused.[30] The trial court allowed defendant to make a statement prior to sentencing. He had an opportunity to argue any mitigating circumstances he felt could bring him a lesser sentence, and to make the court aware of his background and circumstances. Defendant does not say what his attorney should have argued *231 that he himself did not argue. Nor does he show what a pre-sentence investigation would have revealed to the trial court that he did not reveal himself in his lengthy statement.
The mere failure to file a Motion to Reconsider Sentence does not in and of itself constitute ineffective assistance of counsel.[31] But if a defendant can "`show a reasonable probability that, but for counsel's error, his sentence would have been different,'" a basis for an ineffective assistance claim may be found.[32] While counsel did not file a Motion to Reconsider Sentence on his behalf, defendant filed a pro se motion, and the trial court denied it on the merits. Defendant does not say what issues counsel could have raised that he himself did not raise in his pro se motion.
A defendant is entitled to a review for constitutional excessiveness regardless of whether he preserved specific sentencing issues for appeal. Defendant does not specify what additional sentencing issues he would have raised had his attorney filed a timely Motion to Reconsider Sentence. He does not show that counsel was deficient in failing to file a Motion to Reconsider, or that he was prejudiced by counsel's failure to file said motion. In any case, as discussed under Assignment of Error Number Two, the sentence imposed is supported by the record.
For the foregoing reasons, defendant fails to meet his burden under the two-part Strickland test.
ERROR PATENT DISCUSSION[33]
Defendant's offense is designated as a sex offense by LSA-R.S. 15:541 (14.1). A review of the record shows that the trial court did not advise defendant of his sex offender registration requirements and his notification requirements. LSA-R.S. 15:542 outlines mandatory registration requirements for those categorized as sex offenders under LSA-R.S. 15:541.[34] Additionally, LSA-R.S. 15:542.1 sets out notification requirements for those categorized as sex offenders. LSA-R.S. 15:543 A requires the trial court to provide written notice to all sex offenders of the aforementioned registration and notification requirements.
This Court has held that the failure to properly inform a defendant of sex offender registration requirements warrants a *232 remand for written notification. This Court generally remands with an Order that the trial judge inform the defendant of the registration requirements as provided in LSA-R.S. 15:543 A, by sending appropriate written notice to the defendant within ten days of this Court's opinion, and by filing written proof in the record that the defendant received such notice.[35] Recently, in State v. Vincent,[36] this Court remanded with an Order that the defendant be provided with written notification of both the general sex offender registration requirements and the notification provisions.
Based on the foregoing, we remand to the trial court and Order that defendant be informed in writing of both his sex offender registration requirements and his notification requirements.
The trial court failed to advise defendant of the two-year prescriptive period for applying for Post-Conviction Relief under LSA-C.Cr.P. art. 930.8 at the time of sentencing. Accordingly, we order the trial court to provide defendant with written notice of the provisions of Article 930.8, and file written proof of said notice in the record.[37]
AFFIRMED; REMANDED WITH INSTRUCTIONS.
NOTES
[1] The nature of the charged offense requires that the identity of the victim be protected in accordance with LSA-R.S. 46:1844(W). Therefore, she is identified herein by her initials rather than by her full name.
[2] The parties stipulated at trial that the DNA found on the towel and sheet recovered from the victim's house was defendant's.
[3] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[4] The parties stipulated that the semen collected was defendant's.
[5] LSA-C.E. art. 403; State v. Mosby, 595 So.2d 1135, 1138 (La.1992); State v. Brasseaux, 05-41, p. 19 (La.App. 5 Cir. 12/13/05), 919 So.2d 738, 749.
[6] The failure to file a Motion to Reconsider Sentence under LSA-C.Cr.P. art. 881.1, or to state specific grounds upon which the motion is based, limits a defendant to a review of the sentence for constitutional excessiveness. State v. Hester, 99-426, p. 10 (La.App. 5 Cir. 9/28/99), 746 So.2d 95, 103, writ denied, 99-3217 (La.4/20/00), 760 So.2d 342.
[7] State v. Johnathan Myers, unpublished Writ No. 07-KH-561 (La.App. 5 Cir. 8/7/07).
[8] At the time of sentencing counsel objected to the 20-year term as excessive because he was a first offender. He did not make any further argument.
[9] State v. Fletcher, 03-60, p. 11 (La.App. 5 Cir. 4/29/03), 845 So.2d 1213, 1221.
[10] State v. Wickem, 99-1261, p. 10 (La.App. 5 Cir. 4/12/00), 759 So.2d 961, 968, writ denied, 00-1371 (La.2/16/01), 785 So.2d 839.
[11] State v. Brown, 04-230, p. 4 (La.App. 5 Cir. 7/27/04), 880 So.2d 899, 902.
[12] State v. Cook, 95-2784, p. 3 (La.5/31/96), 674 So.2d 957, 959 cert. denied, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).
[13] 04-1441 (La.App. 3 Cir. 3/2/05), 896 So.2d 1265, writ denied, 05-1334 (La.1/9/06), 918 So.2d 1040.
[14] Collins, 04-1441 at p. 14, 896 So.2d at 1276.
[15] 569 So.2d 650, 655-56 (La.App. 2 Cir. 1990), writ denied, 576 So.2d 25 (La.1991).
[16] State v. Truitt, 500 So.2d 355, 359 (La. 1987).
[17] State v. Peart, 621 So.2d 780, 787 (La. 1993).
[18] Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. LaCaze, 99-0584 (La. 1/25/02), 824 So.2d 1063, cert. denied, 537 U.S. 865, 123 S.Ct. 263, 154 L.Ed.2d 110 (2002).
[19] State v. LaCaze. 99-0584 at 20, 824 So.2d at 1078.
[20] Id., 99-0584 at p. 20, 824 So.2d at 1078-79.
[21] Id., 99-0584 at p. 20, 824 So.2d at 1079.
[22] 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).
[23] Id., 426 U.S. at 618-19, 96 S.Ct. at 2244-45.
[24] 04-1309 (La.App. 5 Cir. 4/26/05), 902 So.2d 485, writs denied, 05-1640 (La.2/3/06), 922 So.2d 1173 and 05-1640 (La.2/3/06), 924 So.2d 144
[25] State v. Olivieri, 03-563 (La.App. 5 Cir. 10/28/03), 860 So.2d 207, 213.
[26] State v. Kersey, 406 So.2d 555, 559 (La.1981).
[27] State v. Procell, 365 So.2d 484, 491 (La. 1978), cert. denied, 441 U.S. 944, 99 S.Ct. 2164, 60 L.Ed.2d 1046 (1979).
[28] State v. Ledesma, 01-1413 (La.App. 5 Cir. 4/30/02), 817 So.2d 390, 393.
[29] State v. Galliano, 05-962, p. 29 (La.App. 5 Cir. 8/29/06), 945 So.2d 701, 720, writ denied, 06-2367 (La.4/27/07), 955 So.2d 682.
[30] State v. Bell, 377 So.2d 275, 281 (La.1979).
[31] State v. Lagarde, 07-123, p. 17 (La.App. 5 Cir. 5/29/07), 960 So.2d 1105, 1118. The defendant in this case filed a Writ Application in the Louisiana Supreme Court on August 9, 2007. 07-KH-1650. As of this writing, the Supreme Court has not issued a disposition.
[32] Id., quoting State v. Fairley, 02-168, p. 7 (La.App. 5 Cir. 6/26/02), 822 So.2d 812, 816.
[33] The record was reviewed for errors patent. LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La. 1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir. 1990).
[34] The legislature recently enacted extensive amendments to the sex offender registration statutes, and those amendments became effective on January 1, 2008. Section 6 of 2007 La. Acts 460, the act by which the revisions were enacted, provides, in part, "The provisions of this Act shall apply to all persons convicted of a sex offense or a criminal offense against a victim who is a minor, as defined in R.S. 15:541, regardless of the date of conviction." Although defendant's sentences were imposed prior to the effective date of the revisions, it seems new provisions should be applied to his case. Accord State ex rel. Olivieri v. State, 00-0172, p. 2 (La.2/21/01), 779 So.2d 735, 736-37, cert. denied, 533 U.S. 936, 121 S.Ct. 2566, 150 L.Ed.2d 730 (2001), and 534 U.S. 892, 122 S.Ct. 208, 151 L.Ed.2d 148 (2001), in which the Louisiana Supreme Court held that the application of the sex offender notification provisions to those convicted prior to enactment of the statutes does not violate the ex post facto clauses of the federal and state constitutions. All references to the registration statutes here are to the revised versions.
[35] State v. Gaddis, 07-396, p. 6 (La.App. 5 Cir. 11/13/07), 973 So.2d 21; State v. Stevenson, 00-1296, p. 4 (La.App. 5 Cir. 1/30/01), 778 So.2d 1165, 1166-67.
[36] 07-239, p. 7 (La.App. 5 Cir. 12/27/07), 978 So.2d 967.
[37] State v. Taylor, 04-90, p. 14 (La.App. 5 Cir. 5/26/04), 875 So.2d 962, 971-72, writ denied, 04-1649 (La. 11/19/04), 888 So.2d 193.