998 So.2d 1283 (2008)
STATE of Louisiana
v.
David BEDOYA.
No. 08-KA-630.
Court of Appeal of Louisiana, Fifth Circuit.
December 16, 2008.
Rehearing Denied January 20, 2009.
*1284 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Thomas J. Butler, James W. Adair, Assistant District Attorneys, Gretna, Louisiana, for plaintiff/appellee.
Margaret S. Sollars, Attorney at Law, Thibodaux, LA, for defendant/appellant.
Panel Composed of Judges EDWARD A. DUFRESNE, JR., CLARENCE E. McMANUS, and MADELINE JASMINE.
MADELINE JASMINE, Judge Pro Tempore.
Defendant, David Bedoya, appeals his convictions in a jury trial for one count of forcible rape in violation of LSA-R.S. 14:42.1 and one count of second degree kidnapping in violation of LSA-R.S. 14:44.1. On appeal, he argues that the trial court erred by not granting a mistrial when the prosecutor made reference to the defendant's right to remain silent, and that *1285 the sentence imposed by the court was unduly excessive. He also argues that the trial court committed patent error. For the following reasons, we affirm defendant's conviction and sentence, and remand with instructions.

FACTS
On the evening of July 1, 2006, P.S., the victim, testified that she met her estranged husband, defendant, at a laundromat to return his wallet, which he had dropped during a confrontation at her apartment complex earlier that morning.[1] Prior to meeting defendant, P.S. left a note for her roommate stating that if something bad happened to her, defendant was responsible. P.S. left a picture of defendant with the note.
According to P.S., after she returned the wallet to defendant, he grabbed her and forced her into his car, which was being driven by his friend. P.S. stated that defendant lay on top of her, put his hands around her neck, put a razor in her mouth, and told her that if she yelled, she would cut herself. Approximately 35-40 minutes later, they stopped at a Wal-Mart where defendant bought a video camera. P.S. explained that she did not try to escape while in the Wal-Mart because she was scared and defendant told her he would bring her home if she cooperated.
Instead of taking P.S. home after leaving Wal-Mart, defendant brought P.S. to his apartment in Bridge City, where he forced her inside and locked all the doors.[2] P.S. testified she screamed and hit the walls, but defendant told her the neighbors were not home. She stated defendant proceeded to beat her with various objects, including plastic rubberized floor molding, a handsaw, and a belt. P.S. also stated defendant tied a rope around her neck and hands and tied her to a window while he read the instructions for the video camera. P.S. testified that she believed defendant was going to kill her.
P.S. stated that after defendant beat her, he told her they were going to have sex at which time he turned on the video camera. He told P.S. to give him oral sex and told her she was going to enjoy it. P.S. did not want to have sex with defendant, but complied because she was scared and thought it was the only way defendant would release her. The videotape was shown to the jury and depicted defendant and P.S. having sex. P.S. explained she tried to make defendant believe she was enjoying the sex so he would not hurt her anymore. P.S. testified that after defendant videotaped them having sex, he continued to beat her. At some point, defendant made P.S. call her roommate and tell her they were having a honeymoon and to tell her roommate to stop calling the police because P.S. wanted to stay with defendant.
The next morning defendant brought P.S. to Sonic to get some food and told her not to scream. P.S. testified that as they were leaving Sonic, defendant called her sister and made P.S. tell her she and defendant were back together and on a honeymoon and for her not to call the police. P.S. stated defendant then grabbed her hair and put her head under his leg. She started fighting defendant and managed to kick the car door and escape. She ran to a nearby house where a lady called the police.
*1286 The police arrived and defendant was arrested. Defendant was advised of his rights and indicated he was willing to talk to the police. He stated P.S. was his wife and that the two were simply having an argument. When defendant learned P.S. alleged he raped her, defendant told police about the videotape and claimed it would show he did not rape her. He then consented to a search of his apartment, during which P.S. identified various objects defendant used in the assault.
P.S. was taken to the hospital for a sexual assault exam. Dr. Roberta Lottinger conducted the exam and testified at trial that she independently remembered P.S. because of her extent of trauma. She stated P.S. had extensive bruising on her lower and upper extremities consistent with carpenter's instruments, a mouth laceration consistent with a razor, a shoulder abrasion made with a serrated instrument such as a handsaw, and neck trauma consistent with a rope. Dr. Lottinger explained the bruises were fresh.
Defendant testified at trial and denied he forced P.S. to go anywhere with him. He stated he suggested they go to Wal-Mart to buy a video camera to record the two of them having sex, but denies ever threatening P.S. Defendant stated he and P.S. later had an argument at his apartment. He admitted hitting her with his hand, a belt, and "another white thing," but claimed it was a reaction to her pulling his earring. Defendant specifically denied tying P.S. up with a rope, hitting her with a handsaw, beating her all night and forcing her to have sex with him. Defendant testified P.S. ran from his car the next morning when they were leaving Sonic because he told her he withdrew her immigration application, which was the only way P.S. could stay in the country.

ASSIGNMENT OF ERROR NUMBER ONE
Defendant argues the trial court erred in denying his Motion for a Mistrial after the prosecutor cross-examined him about his post-arrest silence. Specifically, defendant contends the prosecutor's questions about why he failed to tell the police at the time of his arrest about the victim's threats to make him rot in jail impermissibly referenced his post-arrest silence. He maintains the questions were an attempt to undermine his exculpatory version of events offered for the first time at trial in violation of Doyle v. Ohio, 426 U.S. 610, 620, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).
The State maintains there was no Doyle violation because defendant never invoked his right to remain silent, but rather waived his rights and gave a statement to the police. Alternatively, the State maintains any error was harmless because of the overwhelming evidence of defendant's guilt.
At trial, defendant testified that when he and the victim were leaving Sonic, the victim told defendant she wanted to see her kids. He stated he told her no and then proceeded to tell her he withdrew her application of immigration. According to defendant, this meant the victim would not be able to stay in the country. Defendant testified the victim became very upset and threatened to make him rot in jail. She then jumped out of the car and started running and screaming.
On cross-examination, the following exchange occurred between the prosecutor and defendant:
Q. that the last thing that [P.S.] told you before she got out of the car and ran to the Judd's house on July 2nd, 2006, after you told her you had withdrawn her immigration application  and I want to make sure I get this perfectly correct and am not *1287 misunderstanding you in any way you said she told you, I will go back to my country, but I will make you rot in jail.
A. Yes, sir.
Q. She said that on that day?
A. She said that.
Q. Okay. And you think that might be pretty important, right to tell someone before today?
A. I don't think it's important, but at the time when she jumped out of the car, that's why she jumped out of the car. That's why. I don't say it's important right now, I don't say it was important before, I don't say it was important later. I say that's the reason why she, why [P.S.] jumps out of the car, because I took the immigration application and I threw it away. And she got really mad, and she said I will go back to my country, but I will make you rot in jail. And that was exactly what she told me.
Q. And you didn't feel it was important to tell the police that? Because, I mean, according to you, we're here wasting everyone's time because she's lodging false charges against you, according to you.
* * * *
Q. I just want to make sure I understand. You didn't feel, prior to today, that it was important to tell someone she threatened to make you rot in jail because, based, on what you are telling this jury, every single person in this courtroom is wasting their time because she, [P.S.], the victim, is making false charges on you.
A. Yes, sir.
Q. Okay. You didn't feel it was important to tell someone that at the time you were arrested?
A. When I got the interview with the police was a year-and-a-half ago, July, July 1st, 2006, so my English was really, really short. So when I started speaking with the police, I tried to cooperate with the police. There were too many words that I don't know how to express in English. Even at this time I don't know too many words. So, once when I started speaking with the police, there are some words that I can't say, to I start asking to the police how to say that word. And, really, I'm embarrassed why some words that this does not appear in the tape recorder.
Defense counsel immediately objected and moved for a mistrial on the basis the prosecutor commented on defendant's post-arrest silence. The prosecutor responded his questions were not a comment on defendant's silence, but rather were aimed at addressing the statement defendant gave to the police after his arrest. The trial court noted that defendant gave a statement to the police and that it lacked the details to which defendant was testifying at trial. The trial court ruled that a mistrial was not warranted, but nonetheless offered to give a cautionary instruction to the jury, which defense counsel declined. Thereafter, the prosecutor continued to cross-examine defendant and made several references to the fact defendant failed to tell the police the victim threatened to make him rot in jail.
In Doyle v. Ohio, 426 U.S. 610, 620, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the United States Supreme Court held that reference to a defendant's silence at the time of his arrest and after he received Miranda[3] warnings for impeachment purposes violates *1288 the defendant's due process rights. The Supreme Court explained, "every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested .... it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." Doyle v. Ohio, 426 U.S. at 617-18, 96 S.Ct. at 2244-45.
In Doyle, the defendants remained silent after being advised of their right to do so. At trial, each defendant took the stand and gave an exculpatory account of the incident, which was not contradicted by direct evidence. Over defendants' objection, the prosecutor asked each defendant why he had not told his version to the police prior to trial. The Supreme Court reversed the conviction after finding that use of a defendant's post-arrest silence for impeachment purposes, after the defendant received Miranda warnings, violated due process.
In Anderson v. Charles, 447 U.S. 404, 408, 100 S.Ct. 2180, 2182, 65 L.Ed.2d 222 (1980), the United States Supreme Court held that Doyle was not applicable to a case where the defendant did not remain silent after he was given Miranda warnings. In Anderson, the defendant gave a statement to the police after he was arrested for first degree murder and after he was advised of his Miranda rights. The version of the incident the defendant gave to the police in his statement was different than the version of the incident he testified to at trial. According to the police officer, the defendant stated he stole the victim's car from an area near where the murder occurred. However, at trial, the defendant testified he took the car from a parking lot of a tire company, which was in the same area where the murder occurred. On cross-examination, the prosecutor asked the defendant why he did not tell anyone at the time he was arrested where he obtained the car and suggested the defendant fabricated his trial testimony. Id. 447 U.S. at 405-06, 100 S.Ct. at 2181.
The Supreme Court stated that "Doyle does not apply to cross-examination that merely inquires into prior inconsistent statements." Id. It explained that such questioning does not make unfair use of a defendant's silence because a defendant who voluntarily speaks after being advised of his Miranda rights has not been induced to remain silent. The Supreme Court commented that "[a]s to the subject matter of his statements, the defendant has not remained silent at all." Id.
The Anderson court found that the prosecutor's cross-examination did not refer to the defendant's exercise of his right to remain silent, but rather asked the defendant why, if his trial testimony was true, he did not tell the officer that he stole the car from the tire store parking lot as opposed to telling him he took it from the street. The Supreme Court concluded that the prosecutor's questions "were not designed to draw meaning from silence, but to elicit an explanation for a prior inconsistent statement." Id. 447 U.S. at 409, 100 S.Ct. at 2182. As such, the Supreme Court held that Doyle did not apply. The Supreme Court explained that although each of the two inconsistent descriptions of events could be said to involve "silence" insofar as each omitted facts included in the other version, Doyle did not require such a "formalistic understanding of `silence.'" Id.
In many cases, there is no obvious inconsistency between the defendant's post-arrest statement and his trial testimony, but rather there is an omission of facts from the post-arrest statement to which the defendant testifies at trial. The federal courts have explained that

*1289 where post-arrest and trial statements involve the same subject matter and where the post-arrest statement is sufficiently incomplete as to be `arguably inconsistent,' i.e. where the implications of the statements, if not their language, suggests they may be inconsistent [Anderson] applies and comment upon the omissions is permitted.
Pitts v. Anderson, 122 F.3d 275, 281 (5 th Cir.1997).
In Pitts, the federal Fifth Circuit found no Doyle violation where the defendant was cross-examined as to an omission from his post-arrest statement. Id. at 282. At the time of the defendant's arrest, he told the police the victim came at him with a pistol. At trial, the defendant testified that the shooting was accidental. The accidental nature of the shooting was never mentioned in the defendant's post-arrest statement. The Fifth Circuit noted that although the defendant's post-arrest statement and his trial testimony were not necessarily inconsistent, they concerned the same subject matter and their implications were arguably inconsistent. Id. The court found that the defendant waived his right to remain silent as to the subject matter of his post-arrest statement and that the prosecutor's questions were designed to highlight the arguable inconsistency between his statements rather than drawing meaning from his silence. Id. at 282-83.
The present case similarly involves prosecutorial questions about an omission of fact from defendant's post-arrest statement. Defendant gave two statements after his arrest and after being advised of his Miranda rights. Detective Cummings testified that defendant gave a statement at the scene indicating there was no problem and that he and his wife were simply having an argument. At that time, defendant also denied raping his wife and told Detective Cummings about the videotape, which defendant claimed would show he did not rape the victim. Later that night, defendant gave a second statement at the detective bureau in which he stated that at some point after he and the victim left Sonic, she jumped out of the car and ran away screaming. He stated she was upset because he refused her request to see her children.
At trial, defendant testified that after he and the victim left Sonic, the victim became very upset after he told her he withdrew her application for immigration. He stated she jumped out of the car and threatened to make him rot in jail. At no time during either of defendant's two post-arrest statements did he claim the victim threatened to make him rot in jail.
Although defendant's post-arrest statement, in which there were no mention of threats, and his trial testimony, where he stated the victim threatened him, are not necessarily inconsistent, they do concern the same subject matter and their implications are arguably inconsistent: defendant's post-arrest statement suggests the victim was simply upset that she could not see her children, while his trial testimony suggests she was upset she could not remain in the country and vowed to get revenge. Because defendant's post-arrest statement and trial testimony concern the same subject matter and are arguably inconsistent, the prosecutor's questions about why defendant did not tell the police about the victim's threats do not violate Doyle. Defendant waived his right to remain silent as to the subject matter of his post-arrest statement, and the prosecutor's questions were designed to elicit an explanation for arguably inconsistent statements as opposed to drawing meaning from defendant's silence.
This Assignment of Error has no merit.

*1290 ASSIGNMENT OF ERROR NUMBER TWO

Defendant argues his two thirty-year sentences for his forcible rape and second degree kidnapping convictions are excessive. He contends no consideration was given to the fact he is a 24-year-old first offender who is gainfully employed. He also maintains he comes from "a Latin culture where such actions may commonly occur."
The sentencing exposure for both forcible rape and second degree kidnapping is from five to 40 years imprisonment at hard labor with at least two years of the sentence without the benefit of parole, probation, or suspension of sentence. LSA-R.S. 14:42.1(B) and 14:44.1(C). Defendant received a sentence of 30 years on each his forcible rape and second degree kidnapping conviction, which is in the upper limits of the statutory maximum for each offense.
Before imposing defendant's sentences, the trial judge stated defendant had demonstrated deliberate cruelty to the victim, who was his estranged wife. The trial judge noted defendant had used threats of and actual violence in the commission of the offenses and had, at various stages of the crime, used dangerous weapons to commit the crime. He remarked that the victim was tied up and beaten into submission. The trial judge referenced the examining doctor's testimony that she had never seen a rape victim in the condition of P.S.
He further noted defendant's enlistment of a friend to help perpetuate the kidnapping and commented on defendant's use of a razor blade in the victim's mouth to keep her quiet. The trial judge summarized defendant's actions as horrific. The trial judge also commented on defendant's demeanor at trial stating, "[y]our ex-wife describes your demeanor and how you treated her on that date. And during an instance of your testimony here in court, you displayed that same personality." Although the trial judge acknowledged defendant's status as a first offender, he stated the crimes were some of the most severe and noted that "no human being should be treated the way you treated the victim in this case."
Immediately after sentencing, defendant made an oral motion to reconsider his sentence, but stated no grounds for his motion. He indicated he would supplement his oral motion with a written motion and did so two days later. In his written Motion to Reconsider Sentence, defendant simply claimed his sentences were excessive and harsh. The trial court denied his motion.
When a defendant's Motion for Reconsideration of Sentence simply urges that his sentence is excessive, he is relegated on appeal to a claim of constitutional excessiveness. State v. Mims, 93-808 (La.6/18/93), 619 So.2d 1059, 1059-60 (per curiam).
The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. Although a sentence is within statutory limits, it can be reviewed for constitutional excessiveness. State v. Smith, 01-2574, p. 6 (La.1/14/03), 839 So.2d 1, 4. A sentence is considered excessive if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering. Id. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. State v. Lawson, 04-334, p. 6 (La.App. 5 Cir. 9/28/04), 885 So.2d 618, 622.
*1291 A trial judge has broad discretion when imposing a sentence and a reviewing court may not set a sentence aside absent a manifest abuse of discretion. The issue on appeal is whether the trial court abused its discretion, not whether another sentence might have been more appropriate. State v. Dorsey, 07-67, p. 5 (La.App. 5 Cir. 5/29/07), 960 So.2d 1127, 1130. Three factors are considered in reviewing a trial court's sentencing discretion: 1) the nature of the crime, 2) the nature and background of the offender, and 3) the sentence imposed for similar crimes by the same court and other courts. State v. Stewart, 03-920, p. 16 (La.App. 5 Cir. 1/27/04), 866 So.2d 1016, 1027-28, writ denied, 04-0449 (La.6/25/04), 876 So.2d 832.
Defendant's 30-year sentences for forcible rape and second degree kidnapping are comparable to other sentences imposed on similarly situated defendants.
Similar sentences for forcible rape convictions can be found in the following cases. In State v. Greer, 553 So.2d 892 (La.App. 4 Cir.1989), the Fourth Circuit upheld a 40-year sentence for a first offender convicted of forcible rape. The defendant broke into the victim's home and used physical force to rape her. The victim sustained bruises to her face and a cut lip. In State v. Brown, 508 So.2d 118, 121-22 (La.App. 4 Cir.1987), the court upheld the defendant's 35-year sentence for forcible rape after the defendant followed the victim outside from a bar, raped her for over 40-45 minutes, and beat her after raping her. Although defendant had a misdemeanor conviction and several arrests for which charges had been refused, this was his first felony conviction. Also, in State v. Smith, 430 So.2d 31, 46-47 (La.1983), the Louisiana Supreme Court did not find the defendant's 30-year sentence for forcible rape to be excessive. The defendant had a steady work history and no prior convictions, but had two pending sex offense charges. The defendant fraudulently obtained entry into the victim's home and raped her. The Supreme Court noted the defendant's use of force bruised the victim's nose.
As for similar sentences for second degree kidnapping convictions, in State v. Mathieu, 06-946 (La.App. 5 Cir. 5/29/07), 960 So.2d 296, 308-10, writ denied, 07-1424 (La.2/1/08), 976 So.2d 714, this Court upheld a first-time offender's 30-year sentence for second degree kidnapping despite his stable work history and his status as a father of four. The defendant approached the victim, who was his ex-wife, as she was leaving work and pushed her into her car while armed with a gun. He then drove her to Kiln, MS and made several threats to kill himself. After three or four hours, he drove her back to Gretna, where she escaped. The victim suffered no physical harm.
Also, in State v. Washington, 95-771 (La.App. 5 Cir. 2/14/96), 670 So.2d 1255, 1261-62, writ denied, 98-537 (La.9/25/98), 726 So.2d 7, the defendant's maximum 40-year sentence for second degree kidnapping was upheld. The defendant and a companion pointed a gun at the victim and ordered him into the victim's own car. The defendant then drove the victim and a passenger away from the scene to the victim's girlfriend's apartment where the defendant and his companion committed aggravated burglary.
Considering the nature of the offenses, including the violence and cruelty defendant displayed in beating and raping his ex-wife over several hours, as well as sentences imposed for similar crimes, defendant's 30-year sentences for forcible rape and second degree kidnapping are not grossly disproportionate to the offenses or shocking to the sense of justice. We find *1292 that that trial judge did not abuse his broad discretion in sentencing the defendant.
This Assignment of Error has no merit.

ASSIGNMENT OF ERROR NUMBER THREE
Defendant argues it was error patent when the trial court agreed to hold a hearing on his Motion to Reconsider Sentence and then failed to hold such a hearing. He admits he does not have an absolute right to such a hearing, but maintains he should have received one because the trial court granted one. He also asserts he did not receive credit for time served.
It is questionable whether the fact defendant was promised a hearing on his motion to reconsider that the trial court allegedly granted, and then failed to conduct, is an error patent. An error patent is that which is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence. LSA-C.Cr.P. art. 920.
Defendant first made an oral Motion to Reconsider Sentence and subsequently filed a written motion. At the time of his oral motion, defendant stated, "Your Honor, at this time I would orally move for a motion to reconsider the sentence. I will supplement that in writing, and I request a hearing date on that. I'm going to be back here on Thursday. That will give me time to prepare the motion." The trial judge responded, "That's fine with the Court. Thursday?" The record shows the written Motion to Reconsider Sentence was filed on Thursday, February 21, 2008 with an attached Rule to Show Cause Order. The trial judge denied the Motion to Reconsider Sentence on February 26, 2008 by writing "DENIED" on the Rule to Show Cause Order. There is no minute entry for either February 21st or February 26th.
The trial judge's response to defendant's request for a hearing is ambiguous; thus, it is unclear whether the trial judge granted defendant's request. Nonetheless, defendant correctly concedes he does not have an absolute right to a hearing on a Motion to Reconsider Sentence. LSA-C.Cr.P. art. 881.1(D) provides in pertinent part: "[t]he trial court may deny a motion to reconsider sentence without a hearing, but may not grant a motion to reconsider without a contradictory hearing." Article 881.1(D) also provides that "[i]f the court denies the motion without a hearing, the party who made or filed the motion may proffer the evidence it would have offered in support of the motion." Defendant never proffered any evidence that he would have offered in support of his Motion to Reconsider Sentence.
The trial court is not required to conduct a hearing on a Motion to Reconsider Sentence and, thus, there is no error. Additionally, defendant has not shown any prejudice by the summary denial of his motion. Defendant's sole basis for his Motion for Reconsideration of Sentence was that his sentences were excessive. On appeal, at defendant's request, this Court reviewed defendant's sentences for constitutional excessiveness and found his sentences were not excessive.
Defendant also cites as an error patent the failure of the trial court to give him credit for time served. Although the commitment indicates defendant was given credit for time served, the sentencing transcript does not. Generally, the transcript prevails where there is an inconsistency between the minute entry and the transcript. State v. Lynch, 441 So.2d 732, 734 (La.1983).
The granting of credit for time served has long been self-operating under *1293 LSA-C.Cr.P. art. 880. State v. Johnson, 05-180, pp. 10-11 (La.App. 5 Cir. 11/29/05), 917 So.2d 576, 582, writ denied, 06-1254 (La.12/15/06), 944 So.2d 1282. Thus, it is no longer necessary for the Court of Appeal to amend a defendant's sentence to reflect credit for time served.
Defendant does not raise any additional errors patent. Nonetheless, the record was reviewed for additional errors patent in accordance with LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and, State v. Weiland, 556 So.2d 175 (La. App. 5 Cir.1990). It is noted that the trial court failed to advise defendant of the sex offender registration requirements as required by LSA-R.S. 15:542.
Defendant's forcible rape conviction is designated as a sex offense by LSA-R.S. 15:541(14.1). LSA-R.S. 15:542 outlines mandatory registration requirements for those categorized as sex offenders under LSA-R.S. 15:541.[4] Additionally, LSA-R.S. 15:542.1 sets out notification requirements for those categorized as sex offenders. LSA-R.S. 15:543(A) requires the trial court to provide written notice to all sex offenders of the aforementioned registration and notification requirements.
This Court has held that the failure to properly inform a defendant of sex offender registration requirements is error patent that warrants a remand for written notification. Accordingly, we remand this matter and order the trial judge to inform the defendant of the registration requirements as provided in LSA-R.S. 15:543(A) by sending appropriate written notice to the defendant within ten days of this Court's opinion, and by filing written proof in the record that the defendant received such notice. State v. Gaddis, 07-395, p. 6 (La.App. 5 Cir. 11/13/07), 973 So.2d 21, 28, writ denied, 08-156 (La.10/10/08), 993 So.2d 1277; State v. Stevenson, 00-1296, p. 4 (La.App. 5 Cir. 1/30/01), 778 So.2d 1165, 1166-67.
AFFIRMED; REMANDED WITH INSTRUCTIONS.
NOTES
[1] Initials are used under the authority of LSA-R.S. 46:1844(W)(3), which allows the Court to identify a victim of a sex offense by using his or her initials.
[2] Of note, defendant referred to his residence as being in Westwego. However, Detective Cummings testified defendant resided on Oak Ave. in Bridge City and the arrest report lists the address as being located in Bridge City.
[3] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[4] It is noted that the legislature recently enacted extensive amendments to the sex offender registration statutes, and those amendments became effective on January 1, 2008. Section 6 of 2007 La. Acts 460, the act by which the revisions were enacted, provides, in part, "The provisions of this Act shall apply to all persons convicted of a sex offense or a criminal offense against a victim who is a minor, as defined in R.S. 15:541, regardless of the date of conviction." Although defendant's sentences were imposed prior to the effective date of the revisions, it seems new provisions should be applied to his case. Accord State ex rel. Olivieri v. State, 00-0172, p. 2 (La.2/21/01), 779 So.2d 735, 736-37, cert. denied, 533 U.S. 936, 121 S.Ct. 2566, 150 L.Ed.2d 730 (2001), and 534 U.S. 892, 122 S.Ct. 208, 151 L.Ed.2d 148 (2001), in which the Louisiana Supreme Court held that the application of the sex offender notification provisions to those convicted prior to enactment of the statutes does not violate the ex post facto clauses of the federal and state constitutions. All references to the registration statutes here are to the revised versions.