# STATE OF LOUISIANA

# COURT OF APPEAL, THIRD CIRCUIT

# 24-213

**STATE OF LOUISIANA**

**VERSUS**

**BYRON JULIES LEJEUNE**

**\*\*\*\*\*\*\*\*\*\***

ON APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2794-22
HONORABLE KENDRICK J. GUIDRY, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**JONATHAN W. PERRY**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Candyce G. Perret, Jonathan W. Perry, and Charles G. Fitzgerald, Judges.

**AFFIRMED; REMANDED WITH INSTRUCTIONS.**

**Chad M. Ikerd**
**Louisiana Appellate Project**
**600 Jefferson Street, Suite 903**
**Lafayette, Louisiana 70501**
**(337) 366-8994**
**COUNSEL FOR DEFENDANT/APPELLANT:**
**Byron Julies LeJeune**


**Stephen C. Dwight**
**District Attorney, Fourteenth Judicial District**
**John Eric Turner**
**Assistant District Attorney**
**901 Lakeshore Drive, Suite 800**
**Lake Charles, Louisiana 70601**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
**State of Louisiana**

**PERRY, Judge.**

Defendant, Byron Julies LeJeune, appeals his conviction for second degree rape and the sentence the trial court imposed. For the reasons stated below, we affirm Defendant's conviction and sentence, but we remand this matter to the trial court to advise Defendant of the provisions of La.Code Crim.P. art. 930.8.

## FACTS

The facts of this case are fully set forth in the discussion of Defendant's assignments of error, as they concern the sufficiency of the evidence presented at trial and the basis for the sentence imposed.

## PROCEDURAL HISTORY

On February 10, 2022, Defendant was charged by bill of information with one count of domestic abuse battery (strangulation), in violation of La.R.S. 14:35.3(L); one count of domestic abuse battery (first offense, intentional infliction of serious bodily injury), in violation of La.R.S. 14:35.3; one count of domestic abuse aggravated assault, in violation of La.R.S. 14:37.7; one count of second degree kidnapping, in violation of La.R.S. 14:44.1; one count of second degree rape, in violation of La.R.S. 14:42.1; and one count of obstruction of justice, in violation of La.R.S. 14:130.1. The bill of information was subsequently amended on June 19, 2023, dropping the charges for domestic abuse aggravated assault, second degree kidnapping, and obstruction of justice. Defendant pled not guilty to both sets of charges.

On June 22, 2023, Defendant was found guilty on all counts by a unanimous jury after a two-day trial. On September 27, 2023, the trial court sentenced Defendant to three years at hard labor for count one, domestic abuse battery (strangulation); five years at hard labor for count two, domestic abuse battery (first

offense, intentional infliction of serious bodily injury); and thirty years at hard labor without benefit of probation, parole, or suspension of sentence for count three, second degree rape. All sentences are to run concurrently.

Defendant timely appealed his conviction and sentence for second degree rape. In his appeal, Defendant asserts two assignments of error.

## ASSIGNMENTS OF ERROR

I.    The State failed to prove that Byron LeJeune was guilty of Second Degree Rape.

II.   The trial court's [thirty]-year hard labor sentence for Second-Degree Rape was constitutionally excessive and only served to impose needless paid and suffering.

## ERRORS PATENT REVIEW

In accordance with La.Code Crim.P. art. 920, we review all appeals for errors patent on the face of the record. After reviewing the record, we find two errors patent.

The first error patent concerns the advisement of the time limitation for filing an application for post conviction relief. The record does not indicate that the trial court advised Defendant of the prescriptive period for filing post conviction relief.

Louisiana Code of Criminal Procedure Article 930.8 requires the trial court to inform a defendant at sentencing either verbally or in writing that he has two years after the conviction and sentence has become final to seek post conviction relief. *See State v. Viltz*, 18-184 (La.App. 3 Cir. 11/28/18), 261 So.3d 847 (citing *State v. Roe*, 05-116 (La.App. 3 Cir. 6/1/05), 903 So.2d 1265, *writ denied*, 05-1762 (La. 2/10/06), 924 So.2d 163).

Thus, we order the trial court to inform Defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to him within ten

2

days of the rendition of this opinion and to file written proof that Defendant received the notice in the record of these proceedings. *Id.*

The second error patent involves the sentences imposed on counts one and two. In count one, Defendant was convicted of domestic abuse battery by strangulation, a violation of La.R.S. 14:35.3(L), and was sentenced to three years at hard labor. In count two, Defendant was convicted of domestic abuse battery (first offense), causing serious bodily injury, a violation of La.R.S. 14:35.3(N), and was sentenced to five years at hard labor.

The penalty provisions for those offenses are as follows, in pertinent part:

A. Domestic abuse battery is the intentional use of force or violence committed by one household member or family member upon the person of another household member or family member.

. . . .

C. On a first conviction, notwithstanding any other provision of law to the contrary, the offender shall be fined not less than three hundred dollars nor more than one thousand dollars and shall be imprisoned for not less than thirty days nor more than six months. At least forty-eight hours of the sentence imposed shall be served without benefit of parole, probation, or suspension of sentence. . . .

. . . .

L. Notwithstanding any provision of law to the contrary, if the domestic abuse battery involves strangulation, the offender, in addition to any other penalties imposed pursuant to this Section, shall be imprisoned at hard labor for not more than three years.

. . . .

N. Except as provided in Paragraph (M)(2) and Subsection P of this Section, if the offender intentionally inflicts serious bodily injury, the offender, in addition to any other penalties imposed pursuant to this Section, shall be imprisoned at hard labor for not more than eight years.

La.R.S. 14:35.3.[1]

Both subsections "L" and "N" provide for penalties "in addition to any other penalties imposed" under La.R.S. 14:35.3. Subsection "C" provides that the penalty for a first offender is a fine of $300 to $1000 and imprisonment of thirty days to six months, with at least forty-eight hours to be served without benefit of parole, probation, or suspension of sentence. Thus, the sentences imposed for counts one and two in this case are illegal since neither includes a fine and neither restricts benefits for at least forty-eight hours. *See State v. Simon*, 22-726 (La.App. 1 Cir. 12/22/22), 360 So.3d 528, *writ denied*, 23-148 (La. 12/5/23), 373 So.3d 714.

In previous opinions, this court has noted that if the trial court imposed an illegally lenient sentence, we would not correct the error unless the State raised the issue. *See State v. Charles*, 20-498 (La.App. 3 Cir. 5/5/21), 318 So.3d 356. *See also State v. Brown*, 19-771 (La. 10/14/20), 302 So.3d 1109 (supreme court found the court of appeal erred in vacating an illegally lenient sentence absent any complaint by the State). Because the State has not complained on appeal that Defendant's sentences were illegally lenient, we will not correct the error.

## ANALYSIS

### *Sufficiency of Evidence*

For his first assignment of error, Defendant asserts that the evidence is insufficient to prove beyond a reasonable doubt that he was guilty of second degree rape. Defendant argues that while it is undisputed that he physically abused C.Q.[2] and had sex with her numerous times during the occurrence, she never indicated that

---

[1] We note La.R.S. 14:35.3 has been amended since the time of the commission of the offenses herein by Acts 2024, No. 131, § 1, effective August 1, 2024.

[2] The victim's initials are used as required under La.R.S. 46:1844(W).

4

she was unwilling to have sex or that this sex was nonconsensual, that she failed to report her abuse as rape until after it was suggested to her by the police, and that the accompanying "force or violence was not tied to the sexual intercourse." The State counters that, when considering all the events of the night, including, without limitation, the repeated beatings, continuous physical and mental torture, and the deliberate separation of the victim from the outside world, it "was absolutely reasonable for the victim to believe her resistance would not prevent the rape"; therefore, a rational juror could have found that C.Q. was prevented from resisting due to said reasonable belief.

When a defendant challenges the sufficiency of the evidence to support his conviction, that issue must be resolved first. *State v. Hearold*, 603 So.2d 731 (La.1992). The analysis for sufficiency of the evidence is well settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Louisiana Revised Statutes 14:42.1(A)(1) defines second degree rape, in relevant part, as sexual intercourse that is committed without lawful consent because "the victim is prevented from resisting the act by force or threats of physical violence

5

under circumstances where the victim reasonably believes that such resistance would not prevent the rape." There is no dispute that Defendant and C.Q. engaged in sexual intercourse several times during the incident.

*Evidence Presented*

The State put forward ten witnesses: (1) C.Q. (the victim); (2) Deputy Randy Antoine (Calcasieu Parish Sheriff's Office, crime scene forensics); (3) Detective Kardel Guidry (Calcasieu Parish Sheriff's Office (retired), lead investigator); (4) Detective Larry Cormier (Calcasieu Parish Sheriff's Office, cell phone records); (5) Monica Quaal (Southwest Louisiana Crime Lab, DNA); (6) Dr. John Gray (Lake Charles Memorial Emergency Department); and (7) Roy Malone, Jr. (Calcasieu Parish Sheriff's Office, jail records). The State also called several of Defendant's former sexual partners for character testimony, including (8) Kinnidi Jarrel; (9) Olivia Bonner; and (10) Taylor Roy (formerly Taylor LeJeune). The State also entered into evidence photographs of the victim's injuries, forensic evidence, medical documentation, and Defendant's jail calls. Defendant did not call any witnesses.

The first and primary testimony was given by the victim, C.Q. She had previously been in a relationship with Defendant but had broken up with him in June of 2021, about six months before the events described in her testimony. They continued to have sexual intercourse intermittently after breaking up. On December 29, 2021, Defendant messaged C.Q. requesting help finding a bed in rehab, telling

C.Q. that he wanted help changing his life.[3] They met at the Star Casino[4] in Moss Bluff where they talked and played video poker. At a certain point, Defendant suggested that they go to the nearby gas station to pick up some cigarettes, but after getting into C.Q.'s car, he instead suggested they visit Adam, a mutual friend of theirs, and Adam's new girlfriend.[5] C.Q. agreed and did not yet feel concerned or threatened. Defendant drove them to this friend's camper in Holly Beach. They were both drinking at this point.[6]

Matters deteriorated when C.Q.'s mother attempted to call her and then, failing to reach her, called Defendant instead. C.Q.'s mother strongly disagreed with her relationship with Defendant and, during an apparently heated phone discussion, told him to stay away from her. Defendant did not initially react negatively toward C.Q., but he began striking her shortly after they left Adam's residence. Defendant blamed C.Q. for her mother's intervention, complaining that "if [C.Q.] wouldn't tell them all the stuff that [Defendant] does, then they wouldn't hate [him]." He struck her five times before pulling over into an adjacent parking lot; a photograph of C.Q.'s injuries was shown to the jury. After parking, he demanded that she perform oral sex on him, and while she protested that she had to go pee first, he apparently

---

[3] We note that Defendant claimed in a jail call that he did not want to go to rehab, and it was actually C.Q. pressuring him to do so.

[4] The casino was identified earlier in the record as the "Star Casino on Highway 171." C.Q. confirmed it was this casino when she identified it as the casino that is in the same building as Los Panchos restaurant.

[5] Defense counsel noted that the gas station in question was in the same parking lot, the implication being that it seemed unlikely that they got into her car for that reason.

[6] C.Q. later admitted that she drank about five to six beers out of a six pack from the start of the meetup through the time spent at the friend's place. Defense counsel noted the inconsistency between the stated purpose of their meetup—Defendant wanting to go to rehab—and their behavior early in the encounter. We note this would be equally inconsistent with Defendant's claim on the jail calls that rehab was C.Q.'s idea.

"didn't care," and she ended up urinating on herself shortly after they finished having sex. Although she did not explicitly tell Defendant that she did not want to have sex, she testified that she didn't feel that "no" was an option as he had already hit her.

After getting back onto the highway, the next stop was Burger King on Highway 14. While in the drive-through, Defendant began messaging another woman asking for money. After C.Q. commented on this, and after pulling out of the drive-through, Defendant struck C.Q. several more times, confiscated her phone, and ripped off and broke her Apple watch. She also testified that Defendant began strangling her. Defendant subsequently drove them to Joe Breaux Road, a sparsely populated area near a canal, while intermittently striking C.Q. At a certain point during this drive, C.Q. attempted to grab the steering wheel and "almost wrecked" the car due to her growing "nervous[ness] about what was going on." At Joe Breaux Road, Defendant directed C.Q. to get out of the car, stand in front of the car, and to not move. He proceeded to rev up the car, peel out, and drive toward her numerous times, each time prompting her to jump or fall out of the way. Each time she did so, Defendant got out of the car, hit her a few more times, and told her once again not to move. When C.Q. tried to block the hits, Defendant, who was wearing cowboy boots, would kick whichever body part she used to block him. Defendant did this four times. After the fourth instance, Defendant started kicking C.Q. in the chest which, according to her, was "when he had broken my ribs."[7] Defendant also strangled C.Q. again. After this incident, C.Q. was in such pain that it hurt her to

---

[7] It is not known whether C.Q. actually sustained such an injury. Dr. John Gray testified that while he did not find any fractures when examining C.Q. at Memorial Hospital in Lake Charles, he did not specifically examine or request scans of the ribs. Dr. Gray explained that would only have been done if there was a risk C.Q. punctured her lung, which was ruled out as she did not report shortness of breath.

8

move, and it thus took some time for her to comply with his instructions to get back into the vehicle.

A photo of this area of Joe Breaux Road was subsequently entered into evidence. The canal is visible as described by C.Q., as are tire marks and a "brown streak in the grass that leads up to beneath" a pair of shoes. This is where C.Q. claims to have slipped and fallen, as well as one of the places where Defendant beat her. Detective Guidry, on a subsequent drive along with C.Q., also found Burger King ketchup packets at the scene.

After Defendant drove them away from Joe Breaux Road, Defendant turned on a light to get a look at C.Q. and realized the extent of her injuries. As C.Q. phrased it, one "could see in his face that he knew that he had messed up." Defendant attempted to control the damage by taking her jacket, which was bloody, and trying to burn it with a lighter, but he failed so opted to toss it out a window instead while driving towards Pumpkin Center Road.[8] C.Q. described this area as a dead end with tractors, fields, and a crawfish pond. C.Q. was familiar with this area and Joe Breaux Road because Defendant did farm work at these sorts of places. A photograph of the area which matched C.Q.'s description was admitted into evidence and published to the jury. At this point, C.Q. stated she was very afraid of Defendant due to his violent conduct and the secluded nature of the area. She did not feel like she was in any position to argue with him, and she was doubting whether she was going to make it home at all. Defendant and C.Q. had sex again, despite C.Q. crying "the whole time because I was hurting." Defendant refused C.Q.'s pleas to get medical help,

---

[8] The jacket was subsequently recovered by Deputy Randy Antoine of the Calcasieu Parish Sheriff's Office. Blood samples obtained from the jacket matched the victim and an unidentified male.

calling her a "selfish 'B'" who "always have [sic] to start something [and] don't [sic] ever know when to shut [her] mouth." Instead, Defendant declared that he needed more drugs and began driving toward an associate's place for that purpose.

Along the way, they stopped at a gas station, where Defendant directed C.Q. to fill up the gas tank. During cross-examination, the defense counsel raised the question of why she did not take the opportunity to either call for help or alert the gas station attendant inside. C.Q. claimed that she was unable to run at this stage due to her injuries and that regardless there was "no getting away from him."

Later, when they arrived at the associate's trailer, Defendant went inside alone and took the car keys and C.Q.'s phone with him. When he came back outside, he gave her a frozen pork chop in a bag to put on her face and a little green pill that the associate claimed would help the pain. Defendant again refused her request for actual medical assistance. Defendant then drove them back to the casino, parked in the back of the lot, and told C.Q. that they would be spending the remainder of the night there. C.Q. objected to this plan, but Defendant refused to go anywhere else because he claimed, "there was no way to hide what [C.Q.] look[ed] like[.]"

The following morning, Defendant drove them to Topsy, an area near Ragley, to stay in an abandoned house, which he occasionally stayed in, that was adjacent to a camper owned by Defendant's friend. Along the way, C.Q. began discussing potential ways to cover up her injuries so that she could leave, but Defendant refused due to the extent of her bruising. Defendant and C.Q. had sex again after arriving at the abandoned house in Topsy. C.Q. was not expecting this, and Defendant's intentions were only clear when he exited the restroom without any clothes on. She "let him do it[.]" They then went to the adjacent camper to meet Eric Herbert, who immediately noticed the extent of C.Q.'s injuries and got her some ice in a bag and

10

a towel. Defendant claimed that her injuries were the result of an auto accident the previous night. The group proceeded in two vehicles to visit another of Defendant's friends, Tommy, but, after arriving at Tommy's house, Eric's radiator overheated. Defendant joined Eric and Tommy outside to deal with the radiator issue, but this time he left the car keys and C.Q.'s phone in the car.[9] C.Q. took the chance, got into the driver's seat, and took off for Memorial Hospital in Lake Charles.

While at the hospital, C.Q. reported that she was physically assaulted by a known person during a car ride and that she had pain to her right jaw and back area, while medical personnel noted bruising to the face, eyes, and arms.[10] Although she denied any loss of consciousness and was alert and oriented at the time of examination, medical personnel additionally suspected that she had a possible concussion as a result of blunt force head trauma. CAT scans found no fractures or cervical injuries but contusions on the left jaw and side of her skull. As C.Q. did not inform medical personal of any sexual contact, there was no request for a rape kit.

At the end of C.Q.'s questioning, the State asked her whether she believed she could have stopped or resisted Defendant's sexual advances. She testified that she believed any attempts by her to object or resist would have been futile as it "would have just caused me to get hit more," and Defendant would have proceeded to have sex with her regardless.

---

[9] C.Q. speculated that Defendant did not want to raise suspicions about the voluntariness of C.Q.'s presence and the true source of her injuries.

[10] Pictures of the injuries were entered into evidence as Exhibits S-38 and S-39 to S-62. During cross examination, C.Q. admitted that at least one of the pictured injuries, a mark on her neck, was not a "new mark" and was possibly due to previous incidents unrelated to Defendant.

Detective Kardel Guidry of the Calcasieu Parish Sheriff's Office[11] initiated her investigation in January 2022.[12] During her initial meeting with C.Q., Detective Guidry noticed significant bruising on C.Q.'s neck, face, and arms. After interviewing C.Q., Detective Guidry requested that C.Q. ride with her and another detective to trace the route of the events. They visited most of the locations described by C.Q. in her testimony, including Highway 171, the Star Casino in Moss Bluff, Holly Beach, Joe Breaux Road, and Pumpkin Center Road. They did not visit Topsy because police received a tip that Defendant may have been there. Detective Guidry noted in her testimony that while C.Q. did not report that she had been raped during their initial interview, she nonetheless added second degree rape as a charge on the arrest warrant due to C.Q.'s "[s]tatements made and through my years of experience, the markings on her, the bruising, the areas of the bruising and the statements that she provided matched up with my past experience that sex occurred that was forcible." At Joe Breaux Road, in addition to confirming C.Q.'s description of the area, they located skid marks and Burger King ketchup packets.[13]

Subsequent testimony by Detective Larry Cormier of the Calcasieu Parish Sheriff's Office, introduced cell phone tracking data into evidence which showed that C.Q. and Defendant's phones were both present in North Moss Bluff near the casino in the afternoon of December 29, 2021, and traveled together until the

---

[11] Although the Calcasieu Parish Sheriff's Office was already aware of the "battery at a hospital" and had dispatched Deputy Randy Antoine to collect C.Q.'s jacket from Joe Breaux Road as early as December 31, 2021, a potential jurisdictional conflict delayed Detective Guidry's investigation.

[12] We note several discrepancies with Detective Guidry's timeline. She first stated that she "became involved" on January 15, 2022. She then stated she followed up with C.Q. "that same day[,]" which was "five or six days . . . after the incident[,]" despite the incident being in December. When later asked again what day the ride-along was, she said it was on January 7.

[13] A pork chop and a Burger King bag were also located but not taken into evidence.

following day, when C.Q.'s phone diverted to Lake Charles, while Defendant's phone remained in the Topsy area. The areas they traveled to according to the phone tracking data matched C.Q.'s testimony.

The State also introduced several of Defendant's jail calls into the record.[14] While his account of the incident differs from C.Q.'s, there is some overlap. In his telling, C.Q. initiated the encounter by asking him to go to rehab, unlike in C.Q.'s account where he initiated the encounter by asking for her assistance in going to rehab, and, when he demurred and told her he didn't love her, C.Q. punched him. Defendant claimed they then went to the house of his new girlfriend's father for three or four hours, which is about the same amount of time that C.Q. claimed they spent at Adam's house, the friend in Holly Beach. He also claimed that he was on Adderall, Xanax, and alcohol during the events of the night and that at least the Adderall was supplied by C.Q. While he specifically admitted that he put his hands on C.Q., beat her, and threw her jacket out the window, he was adamant that he "[m]ost definitely did not" rape her.

C.Q. described her prior relationship with Defendant at length. Defendant had a long history of physically abusing her, particularly when her kids were away and when they were together in automobiles. She would often have to wear sunglasses inside to cover these injuries. On one occasion, he ripped a light bar out of a closet and struck her on the head with it. The State admitted into evidence several photographs of her injuries from prior incidents, including one photograph that appeared to show when he bit her leg. A notable feature of their relationship was

---

[14] Written transcripts of these jail calls were entered into the record as Exhibits S-108, S-110, and S-111, which were from December 29, 2022, June 8, 2023, and June 13, 2023, respectively. Although it is not clear who Defendant is talking to in these jail calls, during sentencing Defendant stated that at least some of the jail calls were with Olivia, presumably Olivia Bonner.

how Defendant would frequently threaten to kill himself if she expressed dissatisfaction with or attempted to distance herself from him. The State entered into evidence several text messages showing, among other things, Defendant putting a gun into his mouth while saying, "I'm going to meet my Maw, you don't care so 'eff it.'"

The State called several witnesses[15] who testified that Defendant's behavior towards C.Q. was part of a broader pattern. Kinnidi Jarrel, Olivia Bonner, and Taylor Roy all testified that Defendant physically abused them during their relationships. Kinnidi Jarrel testified that Defendant punched her when they were together and, prior to trial, confided to prosecutors that Defendant had previously strangled her.[16] Olivia Bonner's testimony described how, on at least one occasion, Defendant grabbed her and shoved her head against a window while she was driving. Olivia Bonner noted that she had seen Defendant do the same thing to Kinnidi Jarrell. Taylor Roy testified that Defendant threw objects at her, assaulted her with a belt, punched her in the face, strangled her, locked her in closets, and on one occasion even attempted to run her off the road.[17]

Olivia Bonner and Taylor Roy noted that when they argued with or threatened to leave Defendant, he would sometimes send texts showing him pointing a gun towards his head, similar to the texts he sent C.Q.[18] Both Olivia Bonner and Taylor

---

[15] Two of the witnesses, Kinnidi Jarrel and Olivia Bonner, were not testifying of their own accord. Kinnidi Jarrel was called on an instanter subpoena, while Olivia Bonner stated on the record that she was not present willingly.

[16] At trial, Kinnidi Jarrel denied that Defendant had strangled her, but she did admit that she had told the State otherwise.

[17] This final incident was despite an active restraining order. Defendant was arrested after this incident.

[18] The State entered into evidence Exhibit S-78, a picture of one of these texts.

Roy noted sexual incidents involving Defendant's duplicity. In Olivia Bonner's case, she specifically told Defendant not to ejaculate inside her, he did so anyway, and when she confronted him about this, he apparently laughed it off. In Taylor Roy's case, he falsely claimed he was infertile before proceeding to have sex with her.[19] Taylor Roy described incidents where likely harm was only prevented by outside intervention. While their daughter was sick at the hospital, Defendant became aggressive and was only restrained after Taylor Roy pressed a button to alert the nurses, who called security. Finally, both Olivia Bonner and Taylor Roy testified that there were times, particularly when he was drinking, where Defendant would want to have sexual intercourse with them despite their protests. In Olivia Bonner's case, she said that she would have sex with him anyway out of a desire to avoid arguing with him.[20] Taylor Roy detailed one such incident that became physical when he was "try[ing] to take my clothes off" despite protests and, when she responded by physically pushing him off of her, he kicked her in the stomach and was only stopped by Taylor Roy's brother who overheard the fighting and directly intervened.

*Analysis*

We find the evidence presented by the State at trial was more than sufficient to prove beyond a reasonable doubt that Defendant committed second degree rape of C.Q. This court has previously upheld the sufficiency of a conviction for second degree rape where the defendant did not explicitly threaten the victim while

---

[19] The relationship between Taylor Roy and Defendant started in March 2013. Defendant had a child with Olivia Bonner in 2012.

[20] The State also asked Olivia Bonner if there was "any inkling in your mind that if you didn't have sex with him things could turn physical?" Her response was that while at the back of her mind she considered that possible, "it was [n]ever anything I was scared of, like seriously scared of." This testimony conflicted with what she had previously disclosed to the State.

demanding sex but was nonetheless beating her before and after the demands. *State v. Disedare*, 19-810 (La.App. 3 Cir. 5/13/20), 298 So.3d 342, *writ denied*, 20-800 (La. 12/22/20), 307 So.3d 1041. Similar to this case, the defendant in *Disedare* confined the victim against her will for over thirteen hours,[21] repeatedly beat and strangled her,[22] burned her clothing, and demanded oral sex in between the beatings. While the victim in *Disedare* never rejected the defendant's demands for sex, never told him she did not want to have sex, and never asked him to stop, she insisted that she only complied because she was afraid the defendant would beat her again. This court found that, in light of the victim's fear and the physical abuse before and after the demands for sex, there was sufficient evidence to prove that the victim was prevented from resisting by force and that she reasonably believed resistance would be futile.

In this case, C.Q.'s testimony, which was itself extensively corroborated by physical and digital evidence as well as by the testimony of other witnesses, similarly demonstrated that Defendant demanded sex only after he had begun striking C.Q. Defendant repeatedly beat C.Q. throughout the night, held her against her will through the following morning, and at one point even threatened to run her over with her own car. Further, Defendant conclusively demonstrated that not complying with his demands would lead to physical violence when he beat and kicked C.Q. each time she dodged the car. Considering his violent conduct and in light of his abusive history with her, it was reasonable for C.Q. to conclude that any resistance on her part would not have prevented the rape. Defendant's counter argument, that C.Q.

---

[21] The defendant in *Disedare* also confiscated the victim's keys and phone.

[22] The beatings were severe enough that her eyes were swollen shut due to the facial injuries, and the choking caused her to lose consciousness at one point.

16

essentially consented to the act because she failed to explicitly tell Defendant that she did not want to have sex and did not claim she was raped until after the police filed charges, lacks merit. It is simply not reasonable for Defendant to assume that the person he is beating and holding against her will is complying with his demands for sex out of genuine consent, particularly when the victim is crying during the act. It is impossible to divorce "the physical abuse and the demand for sex" and immaterial that C.Q. did not initially identify what happened to her as a rape. Accordingly, the State has proved beyond a reasonable doubt that Defendant raped C.Q. and that his force or threats of force prevented her from resisting due to a reasonable belief that such resistance would not prevent the rape.

## *Constitutionality of Sentence*

For his second assignment of error, Defendant argues that his thirty-year sentence for second degree rape, without the possibility of probation, parole, or suspension of sentence, is unconstitutionally excessive considering his lack of a criminal record and other mitigating factors. Defendant filed an objection in the record at sentencing and submitted a motion to reconsider sentence, arguing simply that the sentence imposed upon him was excessive.

### *State's Argument*

The State contends that Defendant's sentence is justified due to the prolonged physical and psychological pain that he inflicted on C.Q. through numerous rapes across a twelve-hour period. The State emphasizes that Defendant is an "extremely violent individual" who repeatedly beat and raped C.Q., held her without the ability to contact anyone else, withheld medical treatment despite repeated requests, and at one point continued to have sex with her despite her crying from pain. Furthermore, while Defendant is a first-time offender, the State points out that this was hardly the

17

first time that Defendant physically abused people with whom he was in a relationship. Accordingly, the State asserts that his thirty-year sentence, which is significantly below the maximum, is well deserved and that any less would deprecate the seriousness of Defendant's crimes.

*Analysis*

Louisiana courts have laid out the following guidelines with regard to constitutionally excessive sentence review:

> Sentences within the statutory sentencing range can be reviewed for constitutional excessiveness. *State v. Sepulvado*, 367 So.2d 762 (La.1979). In *State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042–43, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331, a panel of this court discussed the review of excessive sentence claims, stating:
>
>> [Louisiana Constitution Article] I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La. 6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La. 5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).
>
> Further, in reviewing the defendant's sentences, the appellate court should consider the nature of the crime, the nature and background of the offender, and the sentences imposed for similar crimes. *State v. Lisotta*, 98-648 (La.App. 5 Cir. 12/16/98), 726 So.2d 57 (citing *State v. Telsee*, 425 So.2d 1251 (La.1983)), *writ denied*, 99-

433 (La. 6/25/99), 745 So.2d 1183. In *State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061, a panel of this court observed that:

> While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La. 5/31/96); 674 So.2d 957, 958.

*State v. Soileau*, 13-770, 13-771, pp. 4–5 (La.App. 3 Cir. 2/12/14), 153 So.3d 1002, 1005–06, *writ denied*, 14-452 (La. 9/26/14), 149 So.3d 261.

First, this court must look to the nature of the offense. Second degree rape is defined as a crime of violence pursuant to La.R.S. 14:2(B)(10). Beyond that, as the trial court noted, the record shows that Defendant engaged in excessive, deliberate cruelty to C.Q. Defendant raped C.Q. numerous times, including once while she was crying in pain, during a lengthy span of time that encompassed one night and much of the following morning. He repeatedly beat her and threatened to, and possibly even meant to, run her down with an automobile. He "[kept C.Q.] basically in prison for various days" and denied her medical care despite repeated requests. As a result of his egregious conduct, his victim sustained serious physical injuries and at one point doubted she was even going to survive.

Second, this court must look to the nature and background of Defendant. As noted at sentencing, Defendant is a father of six and a first-time offender without any prior criminal convictions. The trial court acknowledged this but opined that while this was "[Defendant]'s first felony conviction[,] he picked a doozy." The trial court described Defendant as follows: "He's a predator, he's an abuser. A

19

manipulator. The Devil, I call it[.]" The trial court specifically highlighted his long history of domestic violence, noting that while C.Q. was not his first victim, she was the victim who spoke up and finally got him convicted. Accordingly, the trial court determined that he posed an undue risk. Further, the trial court also determined that Defendant remained a credible threat to C.Q. and posed a danger to her safety.

Third, this court must compare sentences imposed for similar offenses. Pursuant to La.R.S. 14:42.1(B), second degree rape carries a sentencing range of not less than five and no more than forty years at hard labor, without benefit of probation, parole, or suspension of sentence. Thirty years is in the upper half of the sentencing range but is still well below the maximum. We note that most such convictions involve juveniles, active resistance by the victim, use of a deadly weapon, or explicit threats made right before or during the rape. After excluding such cases and only considering convictions involving first offenders, we nonetheless find that what jurisprudence there is supports Defendant's thirty-year sentence.

In *State v. Bedoya*, 08-630 (La.App. 5 Cir. 12/16/08), 998 So.2d 1283, *writ denied*, 09-484 (La. 11/20/09), 25 So.3d 784, the fifth circuit upheld a thirty-year sentence for a defendant who kidnapped his estranged wife, beat and lacerated her with numerous instruments, and later demanded oral sex. Similar to C.Q., the victim in *Bedoya* "did not want to have sex with defendant, but complied because she was scared and thought it was the only way defendant would release her." *Id.* at 1285. Despite her compliance and efforts to convince the defendant that she was enjoying the sex, which was recorded on video and showed to the jury, he continued to beat her. For cases involving first offenders convicted of committing forcible rape involving either explicit threats against or active resistance by the adult victim, the jurisprudence suggests a range between twenty and forty years, which would make

Defendant's sentence about average.  *State v. Myers*, 07-854 (La.App. 5 Cir. 4/29/08), 981 So.2d 214, *writ denied*, 08-1325 (La. 2/13/09), 999 So.2d 1145 (upholding a twenty-year sentence for forcible rape for a first-time felony offender who, while neither beating nor assaulting his victim, did threaten to kill her in front of her children if she screamed); and *State v. Greer*, 553 So.2d 892 (La.App. 4 Cir. 1989) (upholding a forty-year sentence for forcible rape where a first offender broke into the victim's home, demanded sex, and raped her after a struggle).

The trial court reviewed the pre-sentencing investigation report and considered the sentencing factors outlined in La.Code Crim.P. art. 894.1.  The trial court ultimately concluded that probation or any lesser sentence would deprecate the seriousness of Defendant's offense.  Incarceration for thirty years for second degree rape, in light of Defendant's extreme violence, deliberate cruelty, and lengthy history of domestic abuse, is neither grossly disproportionate nor does it shock the conscience.  Considering the foregoing, we find the trial court did not abuse its discretion when it imposed a concurrent thirty-year sentence at hard labor, without benefit of probation, parole, or suspension of sentence.

## DECREE

We affirm Defendant's conviction and sentence.  We direct the trial court to inform Defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to Defendant within ten days of the rendition of this opinion and to file written proof in the record that Defendant received the notice.

**AFFIRMED; REMANDED WITH INSTRUCTIONS.**